**SANFORD BROS. BOATS, INC.,**
**Appellant,**

v.

**Dalvis VIDRINE, Appellee.**

**No. 25559.**

United States Court of Appeals
Fifth Circuit.

May 15, 1969.

Joaquin Campoy, of Campoy & Horne, New Orleans, La., for defendant-appellant.

John L. Avant, Baton Rouge, La., J. Wendel Fusilier, Ville Platte, La., of Dodd, Hirsch, Barker, Avant & Wall, Baton Rouge, La., Fusilier, Pucheu & Soileau, Ville Platte, La., for complainant-appellee.

Before GOLDBERG and AINSWORTH, Circuit Judges, and SPEARS, District Judge.

GOLDBERG, Circuit Judge:

On this appeal from a Jones Act judgment for a seaman, the appellant-employer, aside from asserting a typical miscellany of cavils, lays proper claim to several trial court errors.

On September 18, 1965, appellant's tug, the D. A. LITTLE, and the barge, SANFORD BROS. NO. 1, owned by a companion corporation, were together in the Gulf of Mexico about four miles from shore. Their mission was to repair underwater pipelines and offshore oil structures that had been damaged by hurricane "Betsy." Due to the arrival of rough weather and signs of an approaching storm, Robert Ammon, the captain of the tug, decided to take the barge in tow and move it into more sheltered waters. To implement this decision, Ammon ordered that the four anchors which kept the barge in place be hauled up and secured against the sides. Three anchors were successfully recovered, but the fourth snagged in one of the offshore oil structures.

When initial efforts to free the tangled anchor failed, Captain Ammon decided to change his towing apparatus before dealing again with the fouled anchor. The towing apparatus consisted of a polyethylene or polypropylene towline extending from the stern of the tug rearwards toward the bow of the barge. About fifteen feet in front of the barge the towline meets a heavy metal shackle, and there divides into two steel cables that are attached to opposite sides of the barge. These cables are collectively known as the "tow bridle," and it was this tow bridle which Captain Ammon had decided to replace by a single towing cable.

Changing the bridle involves certain procedures. The tug must be in front of the barge, backing slowly toward it, while men on the stern of the tug haul in the towline. When the towline and shackle have been successfully retrieved, the bridle must be detached from the deck of the barge so that it too may be hauled aboard the tug. Captain Ammon, who was supervising this operation, ordered a man on the barge to unfasten the port segment of the bridle. The first such operation was carried out without incident, but as the second cable was being unfastened, it was dropped overboard and caught on one of the 5000 pound anchors hanging against the side of the barge. In this position it created an imminent danger of becoming tangled in the propeller of the tug as it was backing down. Plaintiff, Dalvis Vidrine, and three other men on the stern of the tug endeavored to free the snagged section of the bridle cable by hauling on it. However, the only result of their efforts was that Vidrine sprained his back, causing the injury which gave rise to the present suit.

Following his injury, Vidrine reported to Captain Ammon who noted the injury in his "log book." Vidrine was then taken ashore at Morgan City, and reached his home in Ville Platte, Louisiana the following day. Upon his arrival, Vidrine placed himself under the care of his family doctor, who had treated him for a previous back injury. The doctor ordered Vidrine placed in a private hospital, where he remained intermittently for some two and one-half months. Appellant, Sanford Brothers Boats, Inc., then notified Vidrine's attorney that it would authorize no further treatment of Vidrine unless advised in advance. If further treatment should be necessary, appellant indicated that it would make arrangements at the Marine Hospital. For a while, however, Vidrine required no additional treatment.

Eight months later, while working for a different employer, Vidrine again suffered back pains. Without notifying

appellant or seeking help at the Marine Hospital, he put himself once more under the care of his family physician. This time a myelogram indicated the existence of a ruptured intervertebral disc, and Vidrine underwent surgery, apparently with successful results.

On July 19, 1966, Vidrine brought suit in federal district court against the owner of the tug, Sanford Brothers Boats, Inc. (Sanford Bros.), seeking damages for negligence under the Jones Act, 46 U.S.C.A. § 688,[1] and for unseaworthiness under general maritime law. Additionally, Vidrine asserted a cause of action for maintenance and cure until such time as he reached maximum medical recovery.

At trial Vidrine attempted to show that due to the negligence of the seaman in not carrying the tow bridle to the center of the barge before releasing it, the cable became entangled in the anchor and created an emergency in rough seas. His theory was that had it not been for this negligence, he would never have had to pull the cable free and would never have sprained his back. He further argued that the tug was unseaworthy because it lacked a sufficient crew, a capstan, and a spare towline. All of Vidrine's claims and Sanford Bros.' defenses were submitted to a jury with appropriate instructions. The jury returned a general verdict for Vidrine in the amount of $60,000, including therein $2,348.41 for medical expenses already incurred.

On this appeal Sanford Bros. urges a medley of errors, among them the proposition that the jury verdict was contrary to law and against the weight of the evidence. Appellant finds no basis in the record from which the jury might have concluded that the cable was negligently dropped overboard, or that the dropping of the cable proximately caused Vidrine's injuries, or that the tug was unseaworthy. Appellant submits that these inadequacies in the record justify setting the verdict aside and ordering a new trial.

I.

## SUFFICIENCY OF THE EVIDENCE

In determining whether there was sufficient evidence to go to the jury in Jones Act cases we are mindful of the Supreme Court's admonition that "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, *even the slightest,* in producing the injury or death for which damages are sought." (emphasis added.) [2] Rogers v. Missouri Pac. R. Co., 1957, 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493, 499. Appellant argues that even under this liberal standard there was insufficient evidence that the dropping

---

1. 46 U.S.C.A. § 688, the Jones Act, reads as follows:

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.

2. "The standard of liability under the Jones Act is governed by the substantive provisions of the Federal Employers Liability Act." Page v. St. Louis Southwestern Railway Company, 5 Cir. 1963, 312 F.2d 84, 91, 98 A.L.R.2d 639. See also Ferguson v. Moore-McCormack Lines, Inc., 1957, 352 U.S. 521, 523, 77 S.Ct. 459, 1 L.Ed. 2d 511, which expressly adopts the *Rogers* standard for Jones Act cases. It has also been held that "The decisions under the Federal Employers Liability Act are applicable [to Jones Act cases] by reason of the incorporation of the provisions of that Act into the Jones Act." Hopson v. Gulf Oil Corp., 1951, 150 Tex. 1, 237 S.W.2d 352.

of the bridle cable constituted negligence. With this contention we must disagree.

■ A review of all the evidence indicates that testimony relative to the bridle cable was of two kinds: direct testimony given at trial and testimony derived from the pretrial deposition of the tug's captain, Robert Ammon. Putting to one side the deposition testimony as of dubious value for any purpose other than impeachment,[3] the record is still sufficient to warrant a jury determination of negligence. The facts elicited on direct examination of the Captain indicated that the customary manner of detaching a bridle cable required that the cable be carried to the center of the barge before being released.[4] The evidence further revealed that this procedure was not followed at the time the cable became snagged in the anchor,[5] but that instead the cable was dropped over the side of the barge, where numerous protuberances increased its chances of fouling. Plaintiff introduced little or no evidence apart from the Captain's pretrial deposition to explain *why* the seaman on the barge departed from the correct and customary method of releasing the bridle cable. On the other hand, the Captain speculated that the cable might have been pulled out of the seaman's hand by a wave before it could be carried to the center of the barge. Appellant urges that the Captain's conjecture dispelled the possibility of negligence and that, in any event, there was no countervailing evidence in the record upon which the jury could have based a contrary result. This argument misconceives the function of a jury in a Jones Act case.

■■ Sufficient evidence to sustain a jury verdict only requires that there be facts from which a jury might *infer* negligence. Schulz v. Pennsylvania R. Co., 1956, 350 U.S. 523, 76 S.Ct. 608, 100 L.Ed. 668. Where there is a sudden

---

3. We have grave doubts as to whether the deposition of Captain Ammon was available as substantive evidence to establish the truth of its contents. See, Southern Railway Co. v. Gray, 1916, 241 U.S. 333, 337, 36 S.Ct. 558, 60 L.Ed. 1030, 1033; Holland v. Cooper, 5 Cir. 1951, 192 F.2d 214, 216; McCormick, Evidence § 39 (1954). We have no doubt, however, that the deposition was available for purposes of impeachment and that its use for this purpose in no way prejudiced the appellant. Fall v. Esso Standard Oil Company, 5 Cir. 1961, 297 F.2d 411, 417, *cert. denied*, 371 U.S. 814, 83 S.Ct. 24, 9 L.Ed. 2d 55; Community Counseling Service, Inc. v. Reilly, 4 Cir. 1963, 317 F.2d 239, 243.

4. "Q. Captain, what was the usual, customary and proper way to disconnect the two segments of this towing bridle so that the whole thing, the tow rope and bridle, could be retrieved and brought back aboard the tug?
A. Ordinarily the way we done it was the usual and proper way.
Q. What was it?
A. As it was described right here, proceeding to back down and pick up the towline and pick up one at a time.
Q. The proper way to do it is to bring the two segments of the towline and drop them off from the middle of the barge?
A. That is correct.

Q. They are not dropped off as they are disconnected from the bits?
A. They are disconnected from the bits but somewhere in the vicinity where you clear the anchor that is hanging.
Q. When this thing was thrown in the water you say it got hung up on the anchor?
A. Yes, sir.
Q. You have described the position of the anchor in the other diagram you had drawn earlier?
A. Yes, sir."

5. "A. I think I motioned my foreman on the barge to throw the lines off. It was picked up by the men on the stern of the boat and laid on the deck of the boat and then I backed up a little more to get slack in this one here (indicating) and the boy couldn't get it off, and the big wave came in in the meantime and pushed my tug around like this (indicating). If it was pulled out of his hand, it could have been done by the wave. Ordinarily, a man will walk away from these anchors and walk toward the center of the barge and drop it, but apparently the only thing I could figure—this is my guess—when my tug swung down on the wave it jerked the cable out of his hand and when it did, it hung in the corner of the anchor over here."

departure from a well-established practice of safety, and where both the practice and the departure are clearly presented by the evidence, it is not also incumbent upon the plaintiff to exclude every other hypothesis except negligence. *cf.* Tennant v. Peoria & Pekin Union R. Co., 1944, 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520. "Fact finding does not require mathematical certainty. Jurors are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses *or proof of circumstances from which inferences can fairly be drawn."* [emphasis added]. Schulz v. Pennsylvania R. Co., 350 U.S. at 526, 64 S.Ct. at 610.

In Tennant v. Peoria & Pekin Union R. Co., *supra*, the Supreme Court considered an FELA case involving the death of a switchman in the course of his employment. The case was submitted to the jury on the theory that the switchman's death was caused by the failure of an engineer on one of defendant's trains to ring his warning bell as required by a safety rule of the railroad. No reason for the engineer's failure to ring the bell was ever offered. In commenting upon whether the engineer's omission was negligence, and whether there was sufficient evidence from which a jury might so conclude, the Court said:

"As to the proof of negligence, the court below correctly held that it was sufficient to present a jury question. In view of respondent's own rule that a bell must be rung "when an engine is about to move," it was not unreasonable for the jury to conclude that the failure to ring the bell under these circumstances constituted negligence. This was not an operation where bell ringing might be termed unnecessary or indiscriminate as a matter of law. Cf. Aerkfetz v. Humphreys, 145 U.S. 418, 420, 12 S.Ct. 835, 36 L.Ed. 758, 759; Toledo, St. L. & W. R. Co. v. Allen, 276 U.S. 165, 171, 48 S.Ct. 215, 72 L.Ed. 513, 516. * * * There was ample though conflicting evidence that

respondent's written rule, as well as the practice and custom, required the ringing of the engine bell in just such a situation. We cannot say, therefore, that the jury's concurrence in that view was unjustified." 321 U.S. at 33, 64 S.Ct. at 411.

■ The analogy to the case at bar is clear. As in *Tennant*, the instant case involves the sudden departure from an accepted practice of safety. This itself was sufficient circumstantial evidence to permit a jury to conclude that the cable was dropped through the negligence of defendant's employee. It is no answer to say that since the cable might have been pulled from the seaman's hand by a wave, he was not negligent. While this was certainly one explanation of the facts which the jury was entitled to consider, much more positive and compelling explanations have been rejected by juries in the past and their conclusions have been sustained.

In Lavender v. Kurn, 1946, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916, a train switchman was found unconscious on the ground with a fractured skull. The autopsy showed that he had been hit by some "fast moving small round object." 327 U.S. at 648–649, 66 S.Ct. 740. The administrator of plaintiff's estate contended that the switchman had been struck by the mail hook of a passing train. The railroad company contended that he had been murdered. In commenting upon the strength of the defendant's hypothesis and the weakness of the plaintiff's, the Supreme Court said:

"It is true that. there is evidence tending to show that it was physically and mathematically impossible for the hook to strike Haney. And there are facts from which it might reasonably be inferred that Haney was murdered. But such evidence has become irrelevant upon appeal, there being a reasonable basis in the record for inferring that the hook struck Haney. The jury having made that inference, the respondents were not free to relitigate the factual dispute in a reviewing court. Under these circumstances it

would be an undue invasion of the jury's historic function for an appellate court to weigh the conflicting evidence, judge the credibility of witnesses and arrive at a conclusion opposite from the one reached by the jury. See Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 67, 68, 63 S.Ct. 444, 87 L.Ed. 610, 617, 618, 143 A.L.R. 967; Bailey v. Central Vermont R. Co., 319 U.S. 350, 353, 354, 63 S.Ct. 1062, 87 L.Ed. 1444, 1447, 1448; Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520, 525, 15 NCCA (NS) 647. See also Moore, 'Recent Trends in Judicial Interpretation in Railroad Cases under the Federal Employers' Liability Act," 29 Marquette L.Rev. 73.

"It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." 327 U.S. at 652–653, 66 S.Ct. at 743.

We find that the standard of Lavender v. Kurn, *supra,* which is applicable in Jones Act cases, see Ballard v. Forbes, 1 Cir. 1954, 208 F.2d 883, 885, compels us to conclude that the plaintiff in the case at bar has introduced sufficient evidence of negligence to warrant submission of that issue to a jury.

Appellant also contends that there was insufficient evidence of causation between the deckhands' negligence in dropping the tow cable and Vidrine's back injury. It argues that the deckhand's negligence created at most a mere condition, and that the action of plaintiff himself in pulling on the tow bridle was the active intervening agency which caused his injury.

The answer to appellant's argument is found in New York Cent. R. Co. v. Brown, 6 Cir. 1933, 63 F.2d 657, an FELA case in which a defective couple allowed a refrigerator car to become a runaway. The plaintiff seeing the car moving on a downgrade unattended, and realizing the danger of injury to others, sprang to the car ladders and attempted to apply the brake wheel. In so doing his head brushed an overhead electric third-rail causing a shock that made him fall to the ground and injure himself. In his suit against the railroad, plaintiff was met with the argument that his rescue attempt, and not the defective couple, was the true proximate cause of his injury. In rejecting this contention, the Court of Appeals observed:

"Were it not for a rule of law that has generally come to be recognized in determining whether there is unbroken connection between wrongful act and injury (which will presently be discussed), it might be considered that the failure of the appliance in the instant case merely created an incidental condition or situation in which the accident otherwise caused resulted in injury, within the rule stated by Mr. Justice Sanford in Davis v. Wolfe, 263 U.S. 239, 44 S.Ct. 64, 68 L.Ed. 284, in reliance on St. Louis & S. F. Railroad Co. v. Conarty, 238 U.S. 243, 35 S.Ct. 785, 59 L.Ed. 1290, and Lang v. New York Central Railroad Co., 255 U.S. 455, 41 S.Ct. 381, 65 L.Ed. 729, and fully discussed by us in Reetz v. Chicago & Erie Railroad Co., 6 Cir., 46 F.2d 50. Brown was not engaged in making a coupling operation, the defective coupling was not the instrumentality which injured him, and there

would be no liability if some new and independent cause, such as his own negligence, intervened, and became the sole proximate cause of his injury.

"But it has long been settled that the chain of causation is not broken by an intervening act which is a normal reaction to the stimulus of a situation created by negligence, and such normal reaction has been held to include the instinct toward self-preservation, Stott v. Shepard, 2 W.Bl. 892 (the lighted squib case), and the equally natural impulse to rush to others' assistance in emergency, Wagner v. International Railway Co. (Cardozo, C. J.), 232 N.Y. 176, 133 N.E. 437, 19 A.L.R. 1 (the danger invites rescue doctrine). This rule of causation has been repeatedly recognized by this court. Sandri v. Byram (C.C.A.6) 30 F.2d 784, 786; Erie Railroad Co. v. Caldwell (C.C.A.6) 264 F. 947. * * To determine whether there was a continuous succession of events leading proximately from fault to injury, the test is not whether the plaintiff was acting in performance of his duty when injured, but whether his act was a normal response to the stimulus of a dangerous situation created by the fault." 63 F.2d at 657.

See also Graham v. Atlantic C. L. R. Co., 1954, 240 N.C. 338, 82 S.E.2d 346, 352; Restatement (Second) of Torts, § 443 (1965).

█ There was ample evidence in the present case from which a jury could have inferred that Vidrine's efforts to free the towing cable was "a normal response to the stimulus of a dangerous situation created by [defendant's] fault." *Id.* Moreover, the mere possibility of Vidrine's contributory negligence would not have changed this result.

█ The question of proximate cause in an action under the Jones Act turns on whether the actions of the defendant contributed to the injury even in the slightest degree. Proximate cause is not destroyed merely because the plaintiff may also have contributed to his own injury:

"Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, *even the slightest,* in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's *contributory negligence.* Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played *any* part at all in the injury or death. Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities. The statute expressly imposes liability upon the employer to pay damages for injury or death due 'in whole or *in part*' to its negligence. (Emphasis supplied)" Rogers v. Missouri P. R. Co., 352 U.S. at 506–507, 77 S.Ct. at 448.

█ The jury in the present case was given the opportunity to find that Vidrine was negligent in pulling on the tow cable. It declined to do so. Given "the fact that one [who] acts in an emergency he has not caused, * * * would not and could not reasonably be expected to act under tension with the same care, forethought and deliberation as ought to be expected of such a person when not acting under stress," Asaro v. Parisi, 1 Cir. 1962, 297 F.2d 859, 861–862, *cert. denied,* 370 U.S. 904, 82 S.Ct. 1250, 8 L. Ed.2d 400, we cannot say that the jury's decision was without substantial evidentiary support.

There is no substance to appellant's claim that the cases of Manning v. M/V Sea Road, 5 Cir. 1965, 358 F.2d 615 and Crawford v. Indian Towing Co., 5 Cir.

1957, 240 F.2d 308, *cert. denied,* 353 U.S. 958, 77 S.Ct. 865, 1 L.Ed.2d 909, compel a finding in its favor. The *Manning* case involved a longshoreman who was injured by stepping on a defective manhole cover. He was denied recovery because he had full knowledge that only a short time before another member of the crew had been similarly injured. The *Crawford* case is even more blatant. It involved a denial of recovery because the navigator of plaintiff's vessel stubbornly and deliberately held a collision course with another ship knowing that his warning signal had not been detected. The distinguishing feature of these cases is that both involved the reckless or deliberate disregard of a known danger. In such circumstances a determination that the acts of the plaintiff were the *sole* proximate cause of the injury can certainly be justified. Under the facts of the present case, however, where there is no evidence that Vidrine's conduct was either reckless or deliberate, such a position is hardly tenable.

Sanford Bros. final attack on the sufficiency of the evidence relates to the allegations of unseaworthiness. It contends that there was insufficient evidence upon which a jury could have found that the absence of a capstan, spare towline or additional crew members justified a finding of unseaworthiness, or that such unseaworthiness, even if it existed, proximately caused plaintiff's injury.

■ While appellant challenges the sufficiency of the evidence on all three theories (the capstan, the towline and the crew), it is unnecessary for us to consider appellant's claims with respect to the spare towline and the sufficiency of the crew, because error in the submission of these issues to the jury is assigned for the first time on this appeal. See Walker v. Sinclair Refining Co., 3 Cir. 1963, 320 F.2d 302, 305. Not only did appellant fail to object to the court's instructions on these issues, cf. Barney v. Staten Island Rapid Transit R. Co., 3 Cir. 1963, 316 F.2d 38, 42, *cert. denied,* 375 U.S. 826, 84 S.Ct. 67, 11 L.Ed.2d 58; it failed to include them as grounds for its motion for directed verdict. See Stilwell v. Hertz Drivurself Stations, 3 Cir. 1949, 174 F.2d 714, 715. Under these circumstances appellant has not complied with the letter and spirit of F.R.Civ.P. 50 [6] and 51.[7] Friedman v. Decatur Corp., 1943, 77 U.S.App.D.C. 326, 135 F.2d 812; Barnes Amusement Co. v. Olvera, 9 Cir. 1946, 154 F.2d 497, 499. The general rule is fully stated in Rochester Civic Theatre, Inc. v. Ramsay, 8 Cir. 1966, 368 F.2d 748, 752, 753, as follows:

> "Concededly, in a case where there is but a single issue a motion for directed verdict properly preserves for review the sufficiency of the evidence to submit this issue to the jury. Likewise, when an action is based upon numerous interdependent elements, all of

6. F.R.Civ.P. 50:
 (a) Motion for Directed Verdict: When Made; Effect. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.

7. F.R.Civ.P. 51:
 At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury.

which must be proven in order to prevail, failure to carry the burden of proof on any one of these necessary elements will make one vulnerable to a directed verdict. However, where the litigation is made up of independent issues or counts a general motion for a directed verdict will not alone preserve for review the sufficiency of the evidence to support each independent factual issue. Miller v. New York Central Railroad Company, 239 F.2d 10 (7 Cir. 1956).

"A general motion can only go to the case in its entirety and not to the individual submissions. To preserve the individual issues in such a case the appellant must move for a pre-emptory or verdict directing instruction on each of the individual issues which he is challenging, move the challenged issue be removed from consideration of the jury, or object to the instructions on those individual issues setting forth as a reason the lack of supporting evidence or conclusiveness of the proof. Lee v. Pennsylvania R. Co., 192 F.2d 226 (2 Cir. 1951); Vareltzis v. Luckenbach Steamship Company, supra [2 Cir., 258 F.2d 78]. As clearly stated in Rule 51, Fed.R.Civ.P. 'No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires * * *.' O'Malley v. Cover, 221 F.2d 156 (8 Cir. 1955); Palmer v. Miller, 145 F.2d 926 (8 Cir. 1945). Failure of an appellant to take one of the three avenues of attack on the separate issues results in the trial court not being properly apprised of the situation and not being given an adequate opportunity to properly rule on the weaknesses of the individual issues. Barney v. Staten Island Rapid Transit Railway Company, 316 F.2d 38

(3 Cir. 1963), cert denied 375 U.S. 826, 84 S.Ct. 67, 11 L.Ed.2d 58; Hargrave v. Wellman, 276 F.2d 948 (9 Cir. 1960). Consequently, plaintiff has failed to preserve for review the individual factual submissions of this case." 368 F.2d at 752–753.

▇▇▇▇ Appellant's contention that the D. A. LITTLE was not unseaworthy merely because it lacked a capstan [8] was urged upon the trial court in appellant's motion for directed verdict and is therefore properly before us on this appeal. We have carefully examined the record, and we find this objection without merit. The record shows that in the opinion of an experienced seaman, Captain La-Fleur,[9] every seaworthy tug engaged in towing operations ought to carry a capstan. The testimony also indicated that the tug HARVEY on which Vidrine was working at the time of trial routinely utilized a capstan for the purpose of retrieving the towline, shackle and bridle when disengaging from a barge. We hold that under these circumstances there was sufficient evidence to take the capstan issue to the jury.

▇▇▇▇ It is well established that a shipowner, "having knowledge—actual or constructive—that certain activity will occur, is imposed with an absolute duty of supplying equipment for permitting the conduct and accomplishment in reasonable safety of that activity * * *." Mesle v. Kea Steamship Corp., 3 Cir. 1958, 260 F.2d 747, 751, cert. denied, 359 U.S. 966, 79 S.Ct. 875, 3 L. Ed.2d 834. Here there is evidence that on a vessel of this character a capstan is a customary and often necessary piece of equipment for making "hard pulls." Indeed, the record shows that the thirty-five foot tow cables each weighed seventy-five pounds, the shackle over forty

8. "Q. What is a capstan? Can you explain?
A. It is a drive off an engine no matter what it is powered by. The one we have on the boat is part of the main engine. We got a clutch and it makes it rotate.
Q. What is the job of a capstan?
A. It pulls in lines.

Q. Heavy lines?
A. Right."

9. We find no substance to appellant's allegation that the trial judge's questions addressed to this witness were improper. Thurmond v. United States, 5 Cir. 1967, 377 F.2d 448, 451.

pounds and the polypropylene towline approximately one pound per foot of length. Even when such a towing apparatus is merely hanging over the back of the tug, getting it on board is a sufficiently difficult pull to justify the use of a capstan. When even harder pulls are required, a jury might reasonably conclude that a capstan is an outright necessity. Appellant's failure to supply a necessary piece of equipment for an operation that would foreseeably require heavy pulling, including any pulling necessitated by a snagged cable, finds ample support in the record. The jury was therefore free to conclude that appellant's failure to supply a capstan was a breach of its duty to provide for the safe retrieval of the towing apparatus and proximately contributed to Vidrine's injuries. See, Tyndall v. Conduit and Foundation Corporation, 3 Cir. 1959, 269 F.2d 947; Proctor v. Sword Line, City Ct.N.Y.1948, 83 N.Y.S.2d 288; Carleno v. Marine Transport Lines, Inc., 4 Cir. 1963, 317 F.2d 662, 665, *cert. denied*, 375 U.S. 896, 84 S.Ct. 173, 11 L.Ed.2d 125; Ferguson v. Erie Railroad Company, S.D. N.Y.1964, 235 F.Supp. 72.

Captain Ammon's statement that he would not have permitted the use of a capstan in rough seas is only one piece of evidence that need have been considered by the jury. The jury was not required to believe that the captain's retrospective view of the accident was controlling on the issue of proximate cause. As said by the Supreme Court in Tennant v. Peoria, *supra:*

"It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. [cases cited]. That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." 321 U.S. at 35, 64 S.Ct. at 412.

See also Page v. St. Louis Southwestern Railway Company, 5 Cir. 1963, 312 F.2d 84, 87–92, 98 A.L.R.2d 639.

## II.

### EVIDENTIARY RULINGS

Appellant further assigns error in certain evidentiary rulings made by the trial judge. He objects to the cross-examination of Captain Ammon as a "managing agent" of defendant as provided in F.R.Civ.P. 43(b), and he argues that plaintiff's counsel used improper and prejudicial arguments in his closing remarks to the jury. In our view both contentions are without merit.

Rule 43(b) provides, *inter alia*, that "A party may call an adverse party or an officer, director, or *managing agent* of a public or private corporation or of a partnership or association which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party * * *." [emphasis added.] A captain of a vessel, even one so small as the D. A. LITTLE, has transcendent powers over his ship and qualifies as a "managing agent" under Rule 43(b). June T., Inc. v. King, 5 Cir. 1961, 290 F.2d 404, 406, n. 1. While Sanford Bros. does not disagree with this general proposition, it argues that in this instance Captain Ammon should not have been classified as a "managing agent" because the Captain

was no longer in Sanford Bros.' employ at the time of trial.

Appellant relies on Rossano v. Blue Plate Foods, Inc., 5 Cir. 1963, 314 F.2d 174, *cert. denied,* 375 U.S. 866, 84 S.Ct. 139, 11 L.Ed.2d 93, where this court held that it was not an abuse of the trial court's discretion to refuse to allow a party to cross-examine his own witness under Rule 43(b) when the witness was no longer in the employ of defendant. We there wrote:

"The mere fact that Harris had been employed by Blue Plate in the past, either as general employee or 'managing agent', would not operate, in and of itself, to require a holding that he was so deeply encamped with his former employer that his testimony might not be fully and accurately developed by normal presentation." 314 F.2d at 179.

These statements in *Rossano* do not control the instant case. The question in *Rossano* was simply whether the "considerable discretion" of the trial court, see June T., Inc. v. King, 290 F.2d at 406, n. 1, had been abused in *not* permitting cross-examination of a party's own witness without proof that the witness was hostile. But a trial judge's discretion may also be used to permit such cross-examination. It does not follow that a contrary ruling even in the *Rossano* case would have been a clear abuse of the trial court's discretion. If the trial judge's discretion is to have any significance, he must be accorded that degree of latitude to which his close proximity to the witnesses entitles him.

Deference to this principle has impelled the recognition that "courts, in determining who is a 'managing agent' within the terms of Rule 43(b) should not be too technical or literal in their approach * * *." Skogen v. Dow Chemical Company, 8 Cir. 1967, 375 F.2d 692, 701. "The courts should view each case on an *ad hoc* basis and liberally apply the Rule to reach the demands of justice * * *." *Id.*

In N.L.R.B. v. Southwestern Colorado Contractors Ass'n, 10 Cir. 1967, 379 F.2d 360, the demands of justice were met by allowing cross-examination of a witness under Rule 43(b) even though the Association of which the witness had been Secretary was no longer in existence at the time of trial.

"Respondents also attack the subject order on procedural grounds. They object first to the use of leading questions under Rule 43(b), Fed.R. Civ.P., in General Counsel's cross-examination of witness Royce, the Association's secretary up until its dissolution. Such questioning would be allowable, say respondents, only if Royce were the managing agent of an existing association of which all respondent businesses were members. We think respondents' emphasis on the continuing formal existence of the Association is misplaced. By virtue of Royce's status as the proprietor · of one of the respondent firms as well as his former official position within the Association, his interests and sympathies were clearly aligned with those of the other respondent. See generally Journeymen Plasterers' Protective & Benevolent Society of Chicago, v. NLRB, 7 Cir., 341 F.2d 539, 544; Rossano v. Blue Plate Foods, Inc., 5 Cir., 314 F.2d 174, 178–179. Accordingly, with respect to questions propounded to him by General Counsel, he was properly treated as an adverse and hostile witness under Rule 43(b)." 379 F.2d 360, 364–365.

Similarly, in O'Shea v. Jewel Tea Co., 7 Cir. 1956, 233 F.2d 530, the decision of the trial court to permit the calling of defendant's store manager as an adverse witness under Rule 43(b) was sustained even though he was no longer in defendant's employ at the time of trial. Among other reasons for its decision the Court of Appeals noted that the witness "gave answers that were contradictory to his pretrial statement" and "by these answers * * * proved that he was a witness hostile to the plaintiff's action."

233 F.2d at 535. In the case at bar Captain Ammon contradicted his pretrial deposition on a number of points that were essential to plaintiff's action. We also note that while no longer in appellant's employ at the time of trial, Captain Ammon occupied a similar position with another company engaged in similar operations and could reasonably be expected to identify with the interests of shipowners. A careful review of the Captain's testimony convinces us that permitting him to be questioned as an adverse party substantially met the demands of justice and vindicated the trial court's ruling.

 Appellant's contention that this case must be reversed because of improper arguments to the jury by plaintiff's counsel must be rejected for want of a sufficient record on appeal. Appellant has alleged that inadvertently the closing arguments of counsel were not transcribed. He argues that he has complied with the provisions of F.R.A.P. 10(e) [10] (formerly F.R.Civ.P. 75(h)) providing for the submission of a supplemental record. However, his attempted compliance is not adequate. The district judge has certified that he has no independent recollection of any such arguments ever having been made, and appellant by his own admission concedes that no objection to these matters was ever made at trial. The first mention of improper arguments occurred in appellant's post-trial motion. Under these circumstances we are of the opinion that appellate review on the question of improper arguments is not permissible. Camps v. New York City Transit Authority, 2 Cir. 1958, 261 F.2d 320, 323; Century Indemnity Co. v. Arnold, 2 Cir. 1946, 153 F.2d 531, 533.

### III.

### DAMAGES

Appellant's remaining contentions relate to the improper assessment of damages. It argues that the damages awarded by the jury were excessive, that the district court erred in awarding plaintiff prejudgment interest and that no allowance should have been made for plaintiff's private medical costs. We consider each of these issues in the order in which appellant has presented them.

 The contention that the jury verdict of $60,000 was excessive does not appear to be justified by the evidence. Following his injury, Vidrine was in and out of the Ville Platte Medical Center for approximately two and one-half months. During this time he was subjected to intensive therapy including heat treatments, ultrasonics and traction. When his pain became too intense, he was also given narcotics. Even after his release from the Center he continued to undergo traction and to use a weighted corset at home. For the next eight months the pain in his back and legs was continuous, and eventually an operation known as a laminectomy had to be performed.

Subsequent to his operation, Vidrine went to work as a mate aboard the tug HARVEY. He was able to take this job because, unlike his earlier job as a deckhand, it did not require heavy physical labor. However, his activities even as a mate were somewhat circumscribed by his physical limitations. The record shows that if he ever lost his job with

10. F.R.App.P. 10:

\* \* \* \* \*

(e) Correction or Modification of the Record. If any difference arises as to whether the record truly discloses what occurred in the district court, the difference shall be submitted to and settled by that court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the district court either before or after the record is transmitted to the court of appeals, or the court of appeals, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted. All other questions as to the form and content of the record shall be presented to the court of appeals.

the HARVEY, these physical limitations might make other employers less willing to hire him. Since Vidrine had only a fourth grade education, and had always taken jobs in the past involving strenuous physical labor, the jury might have concluded that available occupational alternatives for Vidrine were not numerous and that his injury had seriously impaired his future earning potential and job security. Considering the fact that Vidrine was only twenty-seven years of age at the time of his injury, that he had a life expectancy of approximately forty-two years, that his physical abilities had been impaired and his job opportunities reduced and that he had experienced great pain in the past and might experience more in the future, we cannot say that the jury's verdict was so excessive "as to be indicative of prejudice, passion, partiality, or corruption * *." Jenkins v. Associated Transport, Inc., 6 Cir. 1964, 330 F.2d 706, 712. Far more substantial verdicts have been sustained in analogous circumstances. See, St. Louis Southwestern Railway Company v. Williams, 5 Cir. 1968, 397 F.2d 147 and Mosley v. CIA. MAR. ADRA S.A., S.D. N.Y.1966, 257 F.Supp. 30, aff'd, 362 F.2d 118, cert. denied, Lipsett Steel Products v. Mosley, 385 U.S. 933, 87 S.Ct. 292, 17 L.Ed.2d 213. See also, Ledet v. U. S. Oil of Louisiana, Inc., E.D.La.1964, 237 F. Supp. 183. The district judge carefully considered appellant's claim of excessive damages in denying its motion for a new trial. "It is familiar law that, absent abuse of discretion or clear mistake, the judgment of the judge who presided at the trial that a verdict was not excessive will control." Jenkins v. Associated Transport, Inc., supra at 712.

We consider next the issue of prejudgment interest. The district court in entering judgment for plaintiff awarded interest on the judgment from the date of judicial demand. This was error. The instant case was tried on the law side of the federal court in accordance with plaintiff's election that the case be tried to a jury. cf. Crookham v. Muick, W.D.Pa.1965, 246 F.Supp. 288. 290. While prejudgment interest has been deemed appropriate in Jones Act cases tried in admiralty, Moore-McCormack Lines, Inc. v. Richardson, 2 Cir. 1961, 295 F.2d 583, 592–593; Petition of Marine Mercante Nicaraguense, S.A., S.D.N.Y.1965, 248 F.Supp. 15, 25, modified on other grounds, 2 Cir., 364 F.2d 118, cert. denied, 385 U.S. 1005, 87 S.Ct. 710, 17 L.Ed.2d 544, the courts have uniformly held that prejudgment interest is not available in FELA cases and in Jones Act cases tried at law. National Airlines, Inc. v. Stiles, 5 Cir. 1959, 268 F.2d 400, 406; Louisiana & Arkansas Ry. Co. v. Pratt, 5 Cir. 1944, 142 F.2d 847, 849, 153 A.L.R. 851; Chicago, M., St. P. & P. R. Co. v. Busby, 9 Cir. 1930, 41 F.2d 617; Cortes v. Baltimore Insular Line, 2 Cir. 1933, 66 F.2d 526, reversed on other grounds, 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368; Duvernay v. Alcoa Steamship Co., E.D.La.1963, 217 F.Supp. 698, 700. The reasons for this limitation have ranged from the view that "unliquidated" claims cannot bear interest, cf. Moore-McCormack Lines, Inc. v. Richardson, supra, at 593; Cortes v. Baltimore Insular Line, supra, to the position that 28 U.S.C.A. § 1961 [11] prohibits prejudgment interest in personal injury claims based upon federal law.[12]

11. 28 U.S.C.A. § 1961:
 Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at the rate allowed by State law.

12. Nothing said herein relates to personal injury claims in the federal courts based on diversity of citizenship, cf. Woodmont, Inc. v. Daniels, 10 Cir. 1961, 290 F.2d 186, cert. denied, 362 U.S. 968, 80 S.Ct. 955, 4 L.Ed.2d 900, or to prejudgment interest awarded "as part of the compensation to make the injured party whole." Louisiana & Arkansas Railway Co. v. Export Drum Co., 5 Cir. 1966, 359 F.2d 311, 317; Moore-McCormack Lines, Inc. v.

Duvernay v. Alcoa Steamship Co., *supra.* Whatever the rationale, however, we have found no case which allows prejudgment interest in a suit at law under the Jones Act.[13] As said by Judge West in Duvernay v. Alcoa Steamship Co.:

" * * * in Federal cases, where jurisdiction is based upon Federal law rather than upon diversity, interest on a personal injury claim runs from the date of entry of judgment rather than from the date of judicial demand. United States v. Globe Remodeling Co., D.C., 196 F.Supp. 652; Litwinowicz v. Weyerhaeuser S. S. Co., D.C., 185 F. Supp. 692; Louisiana & Arkansas Ry. Co. v. Pratt, 5 Cir., 142 F.2d 847, 153 A.L.R. 851. Thus, in the instant case, which was predicated upon a Federal statute, the Jones Act, and upon maritime law, it is the opinion of this Court that Title 28 U.S.C.A. § 1961 is controlling, and that interest runs only from date of entry of judgment." 217 F.Supp. at 700.

We have considered appellee's arguments for departing from this rule and sustaining the award of prejudgment interest. However, we find them unpersuasive. We have also considered the possible effect of the recent unification of the Admiralty and Civil Rules, see Order, 86 S.Ct. at p. 204 (1966); Bradley, Admiralty Aspects of the Civil Rules, 41

F.R.D. 257 (1966); Proposed Amendments to Rules of Civil Procedure, 34 F.R.D. 325 (1964), but find nothing therein that would change this result. The award of prejudgment interest was therefore improper.

The final issue raised on this appeal is whether or not the district court erred in permitting plaintiff to recover the costs of private medical care when free medical services were available at a nearby Marine Hospital. We hold that it did.

"The cases have consistently held that a seaman's right to maintenance and cure is forfeited by voluntary rejection of hospital care on his part (see Luth v. Palmer Shipping Corp., 1954 A.M.C. 502, 210 F.2d 224, 228 (3 Cir., 1954), and cases there cited). It seems to have been consistently recognized that a seaman is not entitled to reject free services available from Government maintained hospitals (such as those maintained by the Public Health Service or the Philadelphia General Hospital, supported by the City of Philadelphia) without showing that the treatment available there is inadequate, and there is no such showing in this record." O'Neill v. United States, D.C., 157 F.Supp. 193.

There is likewise no showing in the record before us that Vidrine attempted

---

Amirault, 1 Cir. 1953, 202 F.2d 893, 895; Moore-McCormack Lines, Inc. v. Richardson, 2 Cir. 1961, 295 F.2d 583, 593, n. 13, 96 A.L.R.2d 1085. We write only of *interest on the judgment* in a Jones Act case at law.

13. One practical reason for continuing to deny prejudgment interest in FELA cases and Jones Act cases at law is offered in Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d at 593:

"The first F. E. L. A. was enacted in 1906, when prejudgment interest was generally limited to liquidated claims. This distinction was carried over into decisions under the Jones Act, perhaps with good reason in view of the latter statute's express incorporation of F. E. L. A. provisions. See 46 U.S.C.A. § 688. Both statutes provided for an action at law, with right to trial by

jury, although Jones Act suits could also be brought in admiralty. Both statutes envisaged a recovery for pain and suffering and for injuries to the date of trial and thereafter, the computation of interest on which might well be far more confusing to the average jury than to a judge. See National Airlines v. Stiles, supra, 268 F.2d at 406. In any event, no one would be so naive as to suppose that juries do not throw into the scales the years that a plaintiff may have had to wait before his case can be heard by a jury. The practical reason why the courts in jury cases have refused to grant moratory interest may therefore be found in the judicial recognition that a jury usually makes some allowance for loss caused by delay."

to obtain free medical services or that he found them inadequate. On the other hand, there is evidence that he was told by one of Sanford Bros.' company doctors that he should consult with his own family physician. There is also evidence that on December 10, 1965, subsequent to Vidrine's treatment at the Ville Platte Medical Center, appellant sent the following notification to Vidrine through his attorney:

> "This office authorizes no further medical treatment for Mr. Vidrine unless we are advised in advance. Should any of Vidrine's attending physicians recommend hospitalization, surgery, or treatment, please so notify us and we will take the necessary steps to authorize treatment or see that treatment is provided at the Marine Hospital."

This notification and the earlier showing that Vidrine was authorized by a company doctor to seek private medical assistance create equities that point in opposite directions. However, they do not create a jury question since the facts relative to Vidrine's conduct are undisputed. *cf.* Fitzgerald v. United States Lines Co., 1963, 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720. When Vidrine was instructed by a company doctor to seek private medical care, his duty vis-a-vis appellant to seek free medical help was as a matter of law indefinitely suspended. But when the appellant notified him of its intention to provide free medical treatment, Vidrine's duty to mitigate his damages by seeking public hospital facilities was reinstated. *cf.* Calmar Steamship Corporation v. Taylor, 1938, 303 U.S. 525, 531, 58 S.Ct. 651, 82 L.Ed. 993; Truman v. Chas. Kurz & Co., D.Or.1965, 239 F.Supp. 636. He could not thereafter ignore his obligations.

It is important to note that the appellant's notification did not arrive in the midst of a continuous course of treatment. If it had, a different case might be presented. Instead, Vidrine had eight months in which to ponder the appellant's message before the need for further medical treatment arose. Under these circumstances he was no longer justified in ignoring his duty to seek the free medical assistance which appellant had agreed to provide. The district court's judgment is therefore modified to exclude all medical expenses incurred by plaintiff subsequent to appellant's notification.

The judgment is affirmed in all respects save prejudgment interest and medical expenses incurred after December 10, 1965. We remand for the entry of judgment in accordance with this opinion.