James L. CHIASSON, Plaintiff-Appellee,

v.

ROGERS TERMINAL AND SHIPPING CORPORATION and Northwestern National Insurance Company, Defendants-Appellants.

No. 80–4005.

United States Court of Appeals, Fifth Circuit.

June 28, 1982.

twelve. The majority agreed with the state court determination. I concur.

Frank M. Coates, Jr., Baton Rouge, La., for defendants-appellants.

James A. Wysocki, New Orleans, La., for plaintiff-appellee.

Before BROWN, GEE and GARWOOD, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Rogers Terminal and Shipping Corporation (Rogers) appeals from an adverse jury verdict holding it liable for damages that James Chiasson, a Rogers employee, suffered as a result of Rogers' negligence. The case necessitates interpretation of the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901 *et seq.* Finding nothing improper in the jury verdict and no mistakes of law, we affirm.

### Going Against the Grain

James Chiasson, a longshoreman employed by Rogers, suffered substantial injuries while working in the forward, lower (No. 1) hold of a Russian vessel, M/V KREML, anchored in the Mississippi River just south of the Interstate 10 bridge. Tied up alongside KREML was Rogers' floating elevator *cum* barge, the K–1. K–1, a previous visitor to this court,[1] is 132 feet in length, 45 feet in width and 10 feet in depth. Lacking engines or propellers, it is towed into the river where it functions as a loading and unloading intermediary between grain barges and oceangoing vessels. Made fast to the receiving (oceangoing) vessel, K–1, with the use of a crane, digs out

---

1. *See Burks v. American River Transportation Co.*, 679 F.2d 69 (5th Cir. 1982).

the holds of grain barges which make up alongside. The crane deposits the grain in a hopper on K–1. Then a marine leg (consisting of a belt with shovels) scoops the grain from the hopper and lifts it over the side of the vessel, where it is deposited in a pipe leading to a funnel over the hold being loaded. At the bottom of the funnel, a grain trimming machine evenly distributes the grain by shooting it into the wings and corners of the hold. Chiasson was injured when K–1 for some reason pivoted away from KREML, so that grain, instead of proceeding along its normal path, poured directly on him. Buried in a mound of several tons of grain, Chiasson sustained back injuries for which he brought suit.

While loading the No. 1 hold of KREML, the aft portion (port quarter) of K–1 was flush against the starboard side of KREML. The forward portion of K–1's port side, however, was opposite the inward curving portion of KREML's bow. In simple terms, a straight line was flush against a curved line, providing, as we recall from our elementary calculus, less stability. K–1 had a bow winch to keep the bow lines between the two vessels taut but lacked a winch at the stern. Instead, crew members tied the hawser at the stern by hand.

On the grain barge, rolling hatch covers protect the cargo from the elements. To open the covers, a necessary pre-requisite to unloading the grain, a Rogers tug, the MID-STREAM, would hook them and pull forward (upstream). On the night of Chiasson's injury, MIDSTREAM, tugging on the hatch covers, caused K–1 to pull away from KREML and forward. Secured at the far end but slack at the stern, K–1 could—and apparently did—pivot, precipitating the injury.

Chiasson brought suit against Rogers, his employer, under § 5 of the LHWCA, 33 U.S.C. § 905. The jury, responding to special interrogatories, returned answers upon which the Court entered judgment in his favor. This appeal followed.

### The Bread & Butter

■ Rogers contends that the record contains not one kernel of evidence to support the jury's verdict. We cannot agree. Chiasson testified that Rogers owns another elevator barge, COMET II, which was equipped with winches at both bow and stern. K–1, he stated, ought to have carried similar equipment. While his testimony was self-serving, that fact alone does not render it inadmissible. In addition, Wilfred Gallardo, a safety expert who appeared for Chiasson, opined that a winch at the stern would have held the K–1 tight and prevented it from pivoting. The jury, having a chance to observe the demeanor of the witnesses and to test their credibility, concluded that Rogers was negligent. The record provides support for the jury's finding, which we are neither inclined nor permitted to disturb on appeal. *Sanford Bros. Boats Co. v. Vidrine*, 412 F.2d 958, 963 (5th Cir. 1968), *citing Schulz v. Pennsylvania R. Co.*, 350 U.S. 523, 76 S.Ct. 608, 100 L.Ed.2d 668 (1956).

■ Rogers appears to argue that K–1 is not a vessel. Given the broad sweep given to that term in *Offshore Co. v. Robison*, 266 F.2d 769, 779, 1959 A.M.C. 2049, 2063 (5th Cir. 1959), we have no doubt that K–1, whatever its purpose, is a vessel. *See Burks, supra* note 1.

■ Protesting against "legal schizophrenia", Rogers also asserts that the LHWCA prohibits Chiasson's cause of action. Beginning at the beginning, we refer first to § 905(b), which states:

(b)[i] In the event of injury to a person covered under this Act caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 33 of this Act [33 U.S.C. § 933], and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. [ii] If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was

caused by the negligence of persons engaged in providing stevedoring services to the vessel. [iii] If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in provided ship building or repair services to the vessel. [iv] The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this Act.[2]

Rogers points out that K–1 and its crew provided "stevedoring services". Thus under part [ii] of § 905(b), it reasons, Chiasson's action is forbidden. We disagree.

In order to understand this claim, we first must survey the background to the 1972 Amendments and, specifically, § 905(b). Since its debut in 1927, the LHWCA has provided that the liability of an employer "shall be exclusive...." 33 U.S.C. § 905(a).[3] By a combination of subsequent decisions, notably *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed.2d 1099, 1946 A.M.C. 698 (1946), *Ryan Stevedoring Co. v. Pan Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, 1956 A.M.C. 9 (1956), *Reed v. The*

*Yaka*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448, 1963 A.M.C. 1373 (1963), and *Jackson v. Lykes Steamship Co.*, 386 U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488, 1967 A.M.C. 584 (1967), the Supreme Court effectively conjured away the exclusivity language. It permitted a vessel, when an employee of a contracting company brought suit against it (or the vessel) as a third party, to seek full indemnity from the stevedore-employer on the theory that the stevedore had breached the warranty of workmanlike performance (WWLP).[4] Thus did the vessel escape financial responsibility while the stevedore, notwithstanding the clear language of the LHWCA, shouldered the burden of full liability, unlimited by the Act.

No one can doubt that Congress in the 1972 Amendments aimed to overrule *Sieracki* claims based on unseaworthiness[5] and *Ryan* indemnity actions. While increasing substantially the compensation benefits recoverable under the Act, Congress expressly limited the employer's liability by doing away with *Ryan* indemnity actions.[6] Rogers argues, with some literal force, that since it is a stevedoring company whose employees on K–1 were performing "stevedoring services", part [ii] of § 905(b) must mean that Chiasson's negligence action fails.

**2.** Brackets [i] etc., inserted for ease of reference.

**3.** This section was not changed, except for renumbering, by the 1972 Amendments.

**4.** *See* H.R.Rep.No.1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin. News, at 4698–4702.

**5.** *See Burks, supra* note 1.

**6.** The House report states:

The Committee also believes that the doctrine of the *Ryan* case, which permits the vessel to recover the damages for which it is liable to an injured worker where it can show that the stevedore breaches an express or implied warranty of workmanlike performance is no longer appropriate if the vessel's liability is no longer to be absolute, as it essentially is under the seaworthiness doctrine. Since the vessel's liability is to be based on its own negligence, and the vessel

will no longer be liable under the seaworthiness doctrine for injuries which are really the fault of the stevedore, there is no longer any necessity for permitting the vessel to recover the damages for which it is liable to the injured worker from the stevedore or other employer of the worker.

Furthermore, unless such hold-harmless, indemnity or contribution agreements are prohibited as a matter of public policy, vessels by their superior economic strength could circumvent and nullify the provisions of Section 5 of the Act by requiring indemnification from a covered employer for employee injuries.

Accordingly, the bill expressly prohibits such recovery, whether based on an implied or express warranty. It is the Committee's intention to prohibit such recovery under any theory including, without limitation, theories based on contract or tort.

[1972] U.S.Code Cong. & Admin.News at 4704.

But this argument ignores history, history of which Congress was acutely aware. In *The Yaka, supra,* the Supreme Court faced almost the same situation we confront today. The injured employee was employed directly by the chartered owner of the vessel on which he suffered his injury. The Court, finding that "only blind adherence to the superficial meaning of a statute could prompt us to ignore the fact that Pan-Atlantic was not only an employer ... but was also a bareboat charterer", held that the *Sieracki* doctrine of recovery extended to Reed's claim. Any other result would "produce a harsh and incongruous result, one out of keeping with the dominant intent of Congress to help longshoremen." 373 U.S. at 415, 83 S.Ct. at 1353, 10 L.Ed.2d at 453, 1963 A.M.C. at 1378. This result went in the face of § 905 [7] which prescribed the employer's liability for compensation benefits to be his exclusive liability.

In *Jackson v. Lykes Brothers Steamship, supra,* the Supreme Court, relying heavily upon *The Yaka, supra,* held that the widow of a longshoreman who died while working for Lykes as a longshoreman on one of its vessels, could sue the employer for unseaworthiness. Reversing the Louisiana Supreme Court, Justice Black stated, "In this case as in *Yaka,* the fact that the longshoreman was hired directly by the owner instead of by the independent stevedore company makes no difference as to the liability of the ship or its owner." 386 U.S. at 735,

87 S.Ct. at 1422, 18 L.Ed.2d at 491, 1963 A.M.C. at 587.

The legislative history establishes that Congress was well aware of the Supreme Court's actions in this area. In considering these decisions, Congress had to and did face the question whether in the 1972 revisions now under review it should make any distinction between injured harbor workers employed, on the one hand, by independent contractors, and those employed by the vessel owner directly. It chose, in effect, legislatively to adopt (or ratify) the Supreme Court's *Yaka-Jackson* choice, making no distinction.[8]

Two years before the Supreme Court had occasion to consider the statutory problem, this Court in *Smith v. M/V Captain Fred,* 546 F.2d 119, 122, 1977 A.M.C. 353, 357 (5th Cir. 1977), pondered whether the rule of *The Yaka* survived the 1972 Amendments. Posing the question, "Why should an employee be treated differently solely because the ship on which he is injured happens to be owned by his employer instead of a third-party?", Judge Tjoflat, relying upon the legislative history of the 1972 Amendments,[9] concluded that Congress intended to maintain the rule of *The Yaka. See also Walker v. Blacksea S.S. Co.,* 637 F.2d 287, 293 (5th Cir. 1981).

In *Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 266, 99 S.Ct. 2753, 2759, 61 L.Ed.2d 521, 531, 1979 A.M.C. 1167, 1171–72 (1979), the Supreme Court

---

**7.** Now § 905(a).

**8.** The House report states:

The Committee has also recognized the need for special provisions to deal with a case where a longshoreman or ship builder or repairman is employed directly by the vessel. In such case, notwithstanding the fact that the vessel is the employer, the Supreme Court, in *Reed v. S.S. Yaka,* 373 U.S. 410 [83 S.Ct. 1349, 10 L.Ed.2d 448] (1963) and *Jackson v. Lykes Bros. Steamship Co.,* 386 U.S. 731 [87 S.Ct. 1419, 18 L.Ed.2d 488] (1967), held that the unseaworthiness remedy is available to the injured employee. The Committee believes that the rights of an injured longshoreman or ship builder or repairman should not depend on whether he was employed directly by the vessel or by an inde-

pendent contractor. Accordingly, the bill provides in the case of a longshoreman who is employed directly by the vessel there will be no action for damages if the injury was caused by the negligence of persons engaged in performing longshoring services. Similar provisions are applicable to ship building or repair employees employed directly by the vessel. The Committee's intent is that the same principles should apply in determining liability of the vessel which employs its own longshoremen or ship builders or repairmen as apply when an independent contractor employs such persons.

[1972] U.S.Code Cong. & Admin.News at 4705. (Footnotes omitted).

**9.** *See* note 8, *supra.*

gave its imprimatur to our reading of part [ii] of § 905(b). As it explained,

> [I]t is necessary only to construe the second sentence [part [ii]] to permit a third-party suit against the vessel providing its own loading and unloading services *when negligence in its nonstevedoring capacity contributes to the injury.* The second sentence means no more than that all longshoremen are to be treated the same whether their employer is an independent stevedore or a shipowner-stevedore and that all stevedores are to be treated the same whether they are independent or an arm of the shipowner itself.

(emphasis added) When a person employed by the vessel is injured by reason of negligence in the stevedoring operations, part [ii] of § 905(b) does away with any action for damages and confines the employee to his statutory benefits under the Act. Where the injury is due to negligence of the shipowner-employer in non-stevedoring operations, then part [ii] of § 905(b) does not act as a bar.

In *Cavalier v. T. Smith & Son*, 668 F.2d 861 (5th Cir. 1982), following the approach in *Captain Fred*, we held that the LHWCA barred a longshoreman's suit where the negligence that caused the injury was that of those who were performing stevedoring services. Rogers seeks to step into *Cavalier's* shoes, but they are the wrong size and will not fit.

The District Court, heeding our oft-repeated plea,[10] carefully constructed special interrogatories to the jury which separately distinguished between negligence attributable to stevedoring services, *Cavalier, supra,* and that attributable to the vessel itself, *Captain Fred, supra.* The jury found Rogers negligent in both its vessel and stevedoring operations. The finding of vessel operational negligence brings the case within the language of the Supreme Court in *Edmonds, supra,* and our consistent hold-

ings. The jury could reasonably find that the negligent failure to provide a stern winch constitutes dereliction of Rogers' duties as a vessel owner.

AFFIRMED.

---

10. For once we can applaud rather than remonstrate. For a discussion of the usefulness of special interrogatories, *see Guidry v. Kem Manufacturing*, 598 F.2d 402 (5th Cir.), *reh. denied*, 604 F.2d 320 (5th Cir. 1979), *cert. denied*, 445

U.S. 929, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980); *Jones v. Miles*, 656 F.2d 103, 106 n.3 (5th Cir. 1981); *Nardone v. Reynolds*, 538 F.2d 1131, 1137 n.16 (5th Cir. 1976).