SMALL BUSINESS ADMINISTRATION, Plaintiff-Appellant,

v.

David Keith BUBERT and Donna Lu Rathman Bubert, Defendants-Appellees.

No. 86–1378.

United States Court of Appeals, Fifth Circuit.

Feb. 6, 1987.

John B. McNamara, Jr., McNamara & McNamara, Waco, Tex., for plaintiff-appellant.

John A. Montez, Thomas L. Davis, Waco, Tex., for defendants-appellees.

Before CLARK, Chief Judge, GOLDBERG, and GEE, Circuit Judges.

PER CURIAM:

The judgment appealed from is affirmed on the basis of the opinion of the district court, 61 B.R. 362 (W.D.Tex.1986).

Claudius M. DOWDLE, Plaintiff-Appellant, Cross-Appellee,

v.

OFFSHORE EXPRESS, INC., Defendant-Appellee, Cross-Appellant.

No. 85–3520.

United States Court of Appeals, Fifth Circuit.

Feb. 9, 1987.

Bonnie L. Zakotnik, Heisler & Wysocki, New Orleans, La., for plaintiff-appellant, cross-appellee.

Henry S. Provosty, Burke & Mayer, James O. M. Womack, New Orleans, La., for defendant-appellee, cross-appellant.

Before POLITZ, RANDALL and JOLLY, Circuit Judges.

RANDALL, Circuit Judge:

This appeal concerns a seaman's suit under the general maritime law against his former employer to recover maintenance, cure, unearned wages, punitive damages, and attorney's fees for illness sustained while in the service of the employer's vessel. We affirm the district court's award of cure and denial of punitive damages and attorney's fees, but reverse and remand the district court's denial of unpaid wages and award of maintenance.

## I.

### A.

In November of 1983, plaintiff Claudius M. Dowdle signed an employment contract with defendant Offshore Express, Inc. ("Offshore"), agreeing to work as an engineer off the coast of Diego Garcia aboard the M/V *Ellen-F McAllister*, a deep sea tugboat owned by Offshore.[1] The contract

---

1. The contract between Offshore and Dowdle provides as follows:

OFFSHORE EXPRESS, INC. (hereinafter referred to as "The Company") agrees to employ Mr. Claudius Martin Dowdle (hereinafter referred to as "Employee") aboard the M/V Ellen-F McAllister at a semi-annual rate of $22,812.50, with a $2700 bonus upon the successful completion of six (6) months of service. Provided, however, that the Company reserves the right to discharge the Employee for cause at any time. This contract is renewable, upon mutual written agreement between the Company and the Employee for an addi-

tional six (6) months period at the same semi-annual rate and with a $4500 bonus for the second six (6) months.

The Company agrees to furnish the Employee with food and lodging and agrees to pay the cost of medical care while the Employee is employed aboard the Company vessel and during his repatriation.

If the Employee is injured or becomes ill during the term of the contract and is unable to return to his position aboard the Company vessel, he will be repatriated at the expense of the Company and his wages will cease upon repatriation.

provided for a bonus to be paid upon "the successful completion of six months of service," and further provided that if the employee became injured or ill during the term of the contract and was unable to return to his position aboard the vessel, he would be repatriated at Offshore's expense and his wages would cease upon repatriation.

Dowdle began working aboard the M/V *Ellen-F McAllister* on November 30, 1983. In early March of 1984, Dowdle complained of dizzy spells and was admitted to the Naval Hospital in Diego Garcia, where he was prescribed medicine and bed rest. Dowdle was discharged of his duties aboard the *Ellen-F McAllister* on March 30, 1984, and was repatriated to Louisiana.

On April 7, Dowdle was admitted to the East Jefferson Hospital in Louisiana. After seven days of testing, Dowdle was discharged from the hospital with no objective indication of cardio-vascular illness or neurological disfunction. On April 23, Dowdle was released by his referring physician as fit to return to his regular work duties. Dowdle was scheduled for a neurological evaluation following his discharge from East Jefferson Hospital but failed to keep his appointment.

Offshore offered Dowdle a position as a training engineer on a supply boat, but Dowdle refused the position as being too strenuous and resigned his employment with Offshore in May, 1984.[2]

Beginning May 1, 1984, Dowdle worked for John Graham, Inc. for a two-week period. Dowdle then worked for CalDive International, Inc. His later employment with Otto Candies, Inc. continued up to the time of the trial. Throughout his employment with these maritime corporations, Dowdle experienced dizzy spells.

While working as an engineer for Otto Candies aboard the M/V *Prudence Candies,* Dowdle suffered a severe episode of unconsciousness. On March 1, 1985, Dowdle was again admitted to the East Jefferson Hospital, and was diagnosed as suffering from multiple episodes of slowing of heart rhythm and symptoms of loss of consciousness. On March 7, a cardiological surgeon implanted a pacemaker in Dowdle's chest. Dowdle has not experienced dizziness or unconsciousness since the implantation of the pacemaker.

Medical testimony at trial indicated a causal relationship between the dizzy spells manifested aboard the M/V *Ellen-F McAllister* and the change in heart rhythm that necessitated the pacemaker implantation in March, 1985. Such testimony also indicated that Dowdle's condition had steadily worsened since he was first diagnosed.

### B.

In late July of 1984, Dowdle had sought legal assistance because medical bills, incurred as a result of his stay in East Jefferson Hospital in April, 1984, had not yet been paid by Offshore. In August of that

---

The Company agrees to repatriate the Employee at the end of this contract or at the termination of his employment to Houma, Louisiana or to any other location in the continental United States as may be mutually agreed upon, in writing, between the Company and the Employee at the termination of his employment. Prior to ninety (90) days of service, should the employee be terminated or resign, his pay will cease on the date of separation of vessel and cost of transportation be [sic] borne by Employee. At a minimum, there will be a $300 charge.

The Company will not require the Employee to belong to or to be affiliated with any maritime union, or any other labor organization or association.

This contract signed the 25 day of November 1983 by both the Company and the Employee.

2. Apparently challenging the district court's finding that Dowdle resigned in May, 1984, Offshore points to its employment records, which indicate that Dowdle resigned on April 4, 1984 because he "[a]ccepted other employment." Exhibit 14 at 1. As of April 4, 1984, however, Dowdle had not yet been repatriated and was still *en route* to the United States. It is difficult to see how or when on this voyage Dowdle would have been able to find other employment. On this record, we cannot hold the district court's finding that Dowdle resigned in May to be clearly erroneous. *See* Fed.R.Civ.P. 52(a).

year, Dowdle brought suit against Offshore, seeking maintenance, cure, unearned wages and bonuses, punitive damages, and attorney's fees resulting from his illness aboard the M/V *Ellen-F McAllister.*

After a one-day bench trial, the district court found that Dowdle reached "maximum cure" following the implantation of the pacemaker on March 7, 1985. The court awarded maintenance and cure to Dowdle from the time of his initial repatriation up to the date of maximum cure, excluding from the maintenance award those days spent in the hospital. The court found, however, that Dowdle had waived his right to unearned wages by a clause in his employment contract providing as follows: "If the Employee is injured or becomes ill during the term of the contract and is unable to return to his position aboard the Company vessel, he will be repatriated at the expense of the Company and his wages will cease upon repatriation." Relying upon a district court decision that the rate of maintenance payments may be fixed by a collective bargaining agreement, *Grove v. Dixie Carriers, Inc.,* 553 F.Supp. 777 (E.D.La.1982), the district court reasoned that if maintenance payments may be regulated, unearned wages may be regulated as well. Finally, the district court found that the evidence did not warrant an award of punitive damages.

Dowdle appeals the district court's refusal to award unearned wages and punitive damages. Dowdle argues that unearned wages, like maintenance and cure, are not subject to contractual abrogation. Dowdle attacks the denial of punitive damages and attorney's fees as clearly erroneous, asserting that the evidence did support such an award.

Offshore cross-appeals, arguing that Dowdle forfeited his right to maintenance and cure, and, alternatively, that Dowdle's employment aboard three other ships during the period in question placed exclusive, or at least proportionate, responsibility on those employers for the time Dowdle worked for them.

We grant in part and deny in part both the appeal and the cross-appeal.

## II.

The appeal presents the novel question of whether an injured seaman's right to unearned wages may, unlike his right to maintenance and cure, be abrogated by a contractual provision. Finding no reason to treat unearned wages differently, at least in this context, from maintenance and cure, we reverse the decision of the district court.

Dowdle attacks the district court's decision, arguing first that because the contractual clause in question refers only to "wages," and not to the seaman's right to unearned wages, the right to unearned wages is not called into question by the provision. Second, Dowdle criticizes the district court's reliance on *Grove v. Dixie Carriers, Inc.,* 553 F.Supp. 777 (E.D.La. 1982) (rate of maintenance payments may be fixed by collective bargaining agreement), as support for its reasoning that, since the rate of maintenance may be regulated by contract, unearned wages may also be regulated by contract. Dowdle distinguishes regulation of the rate of maintenance payments, as in *Grove,* and the complete abrogation of the seaman's right to unearned wages suggested by the contractual provision in question here. Contractual abrogation of the right to unearned wages, like abrogation of the right to maintenance and cure, cannot be judicially countenanced. Finally, Dowdle argues that the provision is ambiguous and parol evidence suggests the parties never intended it to apply to cases such as that of Dowdle.

Offshore, on the other hand, applauds the district court's reasoning, adding only that the shipowner has traditionally been authorized to set out in the articles the contractual period of employment. Since the provision had the effect of limiting Dowdle's period of employment, the district court's recognition of the provision was justified in maritime law.

An injured seaman's right to unearned wages, maintenance, and cure has been

legally recognized for almost one thousand years. *See* 2 M.J. Norris, *The Law of Seamen* § 26:3 & n. 4 (4th ed. 1985). The Laws of Oleron, frequently cited as the blueprint for subsequent medieval maritime codes, provided for the injured seaman as follows:

> If it happens that sickness seizes on any one of the mariners, while in the service of the ship, the master ought to set him ashore, to provide lodging and candlelight for him, and also to spare him one of the ship-boys, or hire a woman to attend him, and likewise to afford him such diet as is usual in the ship; that is to say, so much as he had on shipboard in his health, and nothing more, unless it please the master to allow it him; and if he will have better diet, the master shall not be bound to provide it for him, unless it be at the mariner's own cost and charges; and if the vessel be ready for her departure, she ought not to stay for the said sick party—but if he recover, he ought to have his full wages, deducting only such charges as the master has been at for him. And if he dies, his wife or next kin shall have it.

Laws of Oleron, art. VII, *reprinted in* 30 F.Cas. 1171, 1174–75 (1897) (appendix) (footnote omitted). The United States courts have long enforced the seaman's right to maintenance, cure, and unearned wages. *See* The Osceola, 189 U.S. 158, 175 (1903) ("the law may be considered as settled upon the following propositions: 1. That the vessel and her owners are liable, in case a seaman falls sick, or is wounded, in the service of the ship, to the extent of his maintenance and cure, and to his wages, at least so long as the voyage is continued."); see also Justice Story's exhaustive review of policy concerns and foreign and medieval authorities supporting the award of maintenance and cure in *Harden v. Gordon*, 11 F.Cas. 480, 482–83, 2 Mason 541 (C.C.D.Me.1823) (No. 6,047). Because of the centuries of litigation requesting enforcement of this triumvirate of rights, courts and commentators have held that the seaman's rights to "[unearned] wages are not separable from maintenance

and cure." 2 M.J. Norris, *supra,* § 26:7 at 19; *see also Robinson v. Pocahontas, Inc.,* 477 F.2d 1048, 1051 (1st Cir.1973) (request for award of unearned wages implicit in complaint's demand for maintenance and cure); *Isthmian Lines, Inc. v. Haire,* 334 F.2d 521 (5th Cir.1964) (treating unearned wages as implicit element of "the traditional maintenance-wages-cure claim."); *Manard v. St. Lawrence Carriers, Inc.,* 266 F.Supp. 500, 501 (D.Del.1967) ("The loss of unearned wages is no less an aspect of damages to a seaman than the loss of maintenance and cure.... [A] seaman's right both to unearned wages and maintenance and cure springs from the same historical derivation."); G. Gilmore & C. Black, *The Law of Admiralty* § 6–12 at 309 (2d ed. 1975) (treating unearned wages as "[t]he third item of recovery in a maintenance and cure action"). We see no reason to begin to treat unearned wages differently than maintenance and cure today.

▮ No agreement is competent to abrogate the seaman's right to maintenance and cure. *Cortes v. Baltimore Insular Line, Inc.,* 287 U.S. 367, 371, 53 S.Ct. 173, 174, 77 L.Ed. 368 (1932). Correspondingly, the seaman's right to unearned wages also may not be contractually abrogated. *See Vitco v. Joncich,* 130 F.Supp. 945, 951 (S.D. Cal.1955) (absent clear quid pro quo received in exchange for contractual abrogation of right to unearned wages, such contractual abrogation is ineffective), *aff'd,* 234 F.2d 161 (9th Cir.1956); *cf.* 46 U.S.C. § 10317 ("a master or seaman by any agreement other than one provided for in this chapter may not ... be deprived of a remedy to which the master or seaman otherwise would be entitled for the recovery of wages.").

We agree with Dowdle that the provision in question abrogates his right to unearned wages. Even assuming arguendo that the district court's decision in *Grove* is correct—a question never addressed by and not presently before this court—there is a fundamental difference between contractual regulation of the rate of maintenance payments and contractual elimination of

such payments altogether. The district court's reliance on *Grove* was misplaced.

 Nor can the district court's decision be shored up by Offshore's argument that the provision in question merely exercises the shipowner's prerogative to fix the contractual period of employment. It is clear from the structure and the language of this contract that the clause does not fix the period of employment, but provides for the termination of wages in the event of repatriation because of illness or injury. The clause in question cannot operate to deprive Dowdle of his right to unearned wages.

We agree with Offshore, however, that "if the seaman recovers from the injury and is fit to return to duty prior to the termination of the voyage or his contractual period, then he is not entitled to continue to receive [unearned] wages past that point." *Griffin v. Oceanic Contractors, Inc.*, 664 F.2d 36, 39 (5th Cir. Unit A June 1981) (footnote omitted), *rev'd on other grounds*, 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982).[3]

### III.

In the second point of error raised in his appeal, Dowdle challenges the district court's finding that Offshore's failure to pay maintenance, cure, and unearned wages was not arbitrary and capricious, thereby subjecting Offshore to punitive damages. In reviewing this finding of the district court, we bear in mind rule 52(a)'s admonition that "[f]indings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R. Civ.P. 52(a). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though

convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

 The district court found that Offshore relied upon the results of Dowdle's April 1984 treatment, which indicated no specific diagnosis or disability. After receiving Dowdle's fit-for-duty slip following this treatment, Offshore offered Dowdle a position as a training engineer on a domestic supply boat. Dowdle refused the offer, and resigned to accept similar employment elsewhere. Offshore paid all medical bills resulting from the April 1984 treatment. Dowdle did not, before suit was filed, bring any additional benefits owed to the attention of Offshore. Based on our review of the record, we cannot say that the district court's finding was clearly erroneous. *Cf. Harrell v. Dixon Bay Transp. Co.*, 718 F.2d 123, 129–30 (5th Cir.1983) (reaching a similar result under the directed verdict standard of review).

### IV.

In its cross-appeal, Offshore attacks the district court's award of maintenance and cure, asserting (1) that Dowdle's failure to keep his appointment with Dr. Arceneaux in April of 1984 forfeited his right to maintenance and cure after that date, and, alternatively, (2) that Dowdle's employment aboard three other ships during the period in question places exclusive, or at least proportionate, responsibility on those employers for the time Dowdle worked for them. We address each of these contentions in turn.

 The rationale underlying our decisions that a seaman may forfeit his right to maintenance and cure is that the seaman has a duty to mitigate his damages. *See, e.g., Caulfield v. AC & D Marine, Inc.*, 633

---

**3.** The Supreme Court reversed the panel decision in *Griffin* only with respect to its interpretation of the maritime wage penalty statute, and did not review that portion of the panel opinion addressing unearned wages. *See Griffin*, 458 U.S. at 569 & n. 5, 102 S.Ct. at 3249 & n. 5

("Petitioner has not questioned the other holdings of the Court of Appeals in his case. Respondent did not appeal from the judgment of the District Court and has not cross-petitioned for certiorari here.").

F.2d 1129, 1133 (5th Cir. Unit A Jan. 1981); *Sanford Bros. Boats, Inc. v. Vidrine,* 412 F.2d 958, 974 (5th Cir.1969). Thus, when an employer has tendered free medical care but the seaman refuses and instead consults a private physician, the seaman has, subject to certain exceptions, forfeited his right to cure. *Kossick v. United Fruit Co.,* 365 U.S. 731, 737, 81 S.Ct. 886, 891, 6 L.Ed.2d 56 (1961); *Sanford Bros. Boats,* 412 F.2d at 973-74; *see also Pelotto v. L & N Towing Co.,* 604 F.2d 396, 402-04 (5th Cir.1979) (forfeiture of right may be limited to right to cure only). In the instant case, we fail to find evidence indicating that Dowdle's failure to visit Dr. Arceneaux, a neurologist, would have mitigated the cardiological problems he later suffered. The district court's finding that Dowdle did not forfeit his rights was not clearly erroneous.

The effect of later employment upon the original employer's obligation to pay maintenance and cure is determined in this circuit by reference to two polarly different authorities, *Wood v. Diamond M Drilling Co.,* 691 F.2d 1165 (5th Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 947 (1983); *Pyles v. American Trading & Prod. Corp.,* 372 F.2d 611 (5th Cir.1967), both of which interpret the Supreme Court's decision in *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). In *Pyles,* the injured seaman was treated, certified as fit for duty, and employed in his chosen occupation by several other shipowners before the trial. Judge Coleman, writing for the court, carefully distinguished the facts of *Pyles* from those of *Vaughan* and a Third Circuit decision approved by *Vaughan, Yates v. Dann,* 223 F.2d 64 (3rd Cir.1955). The basis for distinction in *Pyles* was that *Vaughan* and *Yates* concerned (1) a greviously injured seaman who (2) had been forced to go back to work by (3) the employer's willful failure to make maintenance and cure payments. 372 F.2d at 618. *But cf. Vaughan,* 369 U.S. at 539, 82 S.Ct. at 1004 (Stewart, J., dissenting) (no showing in *Vaughan* that seaman's return to work was brought on by economic necessity). To the contrary, in *Pyles* there was (1)

no showing that "Pyles went back to work because he had demanded and been denied maintenance and cure" and (2) no showing "that if Pyles had sought cure instead of going back to work he would not have experienced maximum medical recovery prior to the date of the jury verdict." *Id.* at 619. The *Pyles* court held that unless the seaman had demanded and been willfully denied maintenance and cure causing a delay in his maximum recovery, he was not entitled to maintenance and cure for the periods he was employed by other shipowners:

> A seaman by voluntarily working at his accustomed trade rather than using maintenance and cure to speed his recovery cannot by those tactics enhance the liability of the shipowner any more than the shipowner can be permitted to minimize his liability by refusing to pay and forcing the seaman back to work.

*Id.* Because the purpose of maintenance and cure is to provide a sick or injured seaman with sustenance and medical care during his convalescence, there is no reason to provide a seaman who is medically fit for regular duties with sustenance already provided by his employment, if such employment is by the seaman's choice and not a result of the original employer's willful failure to perform its maintenance and cure obligations. *See id.*

In *Wood v. Diamond M Drilling Co.,* the court reached an opposite result on different facts. 691 F.2d 1165. *Wood* rejected the shipowner's "proposition that *only* when a seaman's return to work was brought about by economic necessity resulting from the shipowner's failure to pay maintenance and cure is he entitled to maintenance and cure during the period of employment." *Id.* at 1170 (emphasis in original). Instead, the *Wood* court held the seaman to be entitled to maintenance through the point of maximum medical benefit, despite the seaman's voluntary employment with another shipowner during part of this period. *Id.* at 1170-71.

The *Wood* court distinguished *Pyles* on its facts. First, the seaman in *Pyles* at the

time of trial had already recovered maintenance from a later employer for re-injury of the condition developed aboard the defendant's ship. In *Wood,* however, there was no question of a duplicative recovery. *Id.* at 1171 n. 6. Second, unlike the seaman in *Pyles,* the petitioner in *Wood* had not returned to his accustomed trade but had instead taken a clerical job. *Id.* Third, unlike the situation in *Pyles,* the seaman in *Wood* had never been certified as fit for duty, had not been re-injured, and, in fact, had never recovered from his injuries. *Id.* Given these differences in the factual background of the two cases, the *Wood* court found that *Pyles* was not controlling.

The question presented to us is which of these two authorities controls the facts of the case before us, which contains elements of both *Wood* and *Pyles.* As in *Pyles,* Dowdle was certified as fit for duty, did not ask for maintenance payments, and employed himself with another shipowner of his own volition. Although his first job after resigning from Offshore was not in his "accustomed trade," Dowdle's second and third jobs were in his usual capacity of chief engineer. On the other hand, as in *Wood,* there is no question here of a duplicative recovery of maintenance.

 We find, on the basis of the above comparison, that *Pyles* controls the facts of this case. Because Dowdle was fit enough to work by his own choice in his accustomed trade, there is no reason to award him maintenance for periods in which his sustenance was provided by others. *Cf. Johnson v. United States,* 333 U.S. 46, 50, 68 S.Ct. 391, 393–94, 92 L.Ed. 468 (1948) (no maintenance due when seaman "had incurred no expense or liability for his care and support at the home of his parents."). We therefore reverse the district court's award of maintenance and remand for recomputation in accordance with this opinion.[4]

---

**4.** *Pyles'* rationale—that the seaman should not reap a windfall by recovering payments for sustenance during a period in which he is being sustained by a third party—does not extend in this case to the district court's award of cure.

## V.

The judgment of the district court is AFFIRMED with respect to its award of cure and denial of punitive damages and attorney's fees. With respect to its award of unearned wages and maintenance, however, the judgment is REVERSED and REMANDED for further proceedings not inconsistent with this opinion.

Because Dowdle paid for the March 1985 treatment in question under his private insurance policy, the treatment was not paid for by a third party. *See Gauthier v. Crosby Marine Service, Inc.,* 752 F.2d 1085, 1090 (5th Cir.1985).