In the Matter of the Complaint of the **PARISH OF PLAQUEMINES** as Owner of the M/V POINTE–A–LA–HACHE for Exoneration from or Limitation of Liability

No. Civ.A. 01–2967.

United States District Court, E.D. Louisiana.

Nov. 14, 2002.

Patricia Cowen Penton, Randell E. Treadaway, Lawrence R. Plunkett, Jr., Lara Namer DiCristina, Metairie, LA, for Plaquemines Parish, Joseph Longino.

H. Edward Sherman, James Edmon Cazalot, Jr., Travis Jasper Causey, Jr., Law Offices of H. Edward Sherman, New Orleans, LA, for Carlton Huntington.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FALLON, District Judge.

### PROCEDURAL HISTORY

On April 15, 2001, Carlton R. Huntington (Huntington) was injured while working as a deckhand on the passenger ferry M/V POINTE–A–LA–HACHE. The ferry was owned, operated and controlled by Huntington's employer, The Parish of Plaquemines (Plaquemines). The vessel owner filed a petition in this court seeking exoneration from and/or limitation of liability. Huntington filed an answer and claim in this proceeding alleging that his injuries and disabilities were caused or precipitated by the negligence of Plaquemines and/or the unseaworthiness of the vessel, to which plaintiff had privity and knowledge. Plaquemines responded by denying liability and claiming that Huntington's injuries were caused by his own negligence and his resulting disabilities were not related to the incident aboard its vessel, the M/V POINTE–A–LA–HACHE, on April 15, 2001.

This case came on for trial before the Court without a jury on Tuesday, November 5, 2002, and concluded on November 6, 2002.

The Court, having carefully considered the testimony of all the witnesses, the exhibits entered at trial, the record, and pursuant to Rule 52(a) of the Federal Rules of Civil Procedure hereby enters the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes, in whole or in part, a finding of fact, the Court adopts it as such.

*FINDINGS OF FACT*

1.

On April 15, 2001 Carlton R. Huntington was working for Plaquemines Parish as a deckhand aboard its passenger ferry, the M/V POINTE–A–LA–HACHE. He had been working for Plaquemines for at least a year prior to this date. He earned approximately $22,000 per year.

2.

The M/V POINTE–A–LA–HACHE, is a 142″ steel hull passenger ferry bearing Official # D510383 that was built in 1967 by Equitable Equipment Company Shipbuilding Division in Madisonville, Louisiana. The ferry is one of five sister vessels built in the mid 1960's to mid 1970's for service as passenger and vehicle ferries in the State of Louisiana.

3.

Since its construction in 1967, the M/V POINTE–A–LA–HACHE has been in continuous operation 20 hours per day carrying passengers and vehicles across the Mississippi River between Belle Chasse and Scarsdale, Louisiana. Every hour the ferry is in operation, it makes four (4) crossings.

4.

Landing barges are located at both the Belle Chasse and Scarsdale ferry landings. At the Belle Chase landing, the landing barge contains a steel vehicle ramp, also referred to as the apron, that is raised and lowered by steel cables using a counterweight system connected to an electric cable winch on the barge. The steel vehicle ramp, or apron, is 16′ wide. The controls for the electric cable winch are located on the outboard side of the landing barge 15′ forward of the forward end of an opening in the M/V POINTE–A–LA–HACHE's bulwarks through which vessels and passengers enter and exit the ferry while the ferry is moored to the landing barge. (Testimony of Arthur Darden, John Cunningham and Captain Royce Ehret, [Plaquemines Parish Trial Exhibits ·7 and 8] ).

5.

The M/V POINTE–A–LA–HACHE contains openings on the port and starboard sides that are 17′6″ wide through which vehicles and passengers enter and exit the ferry. Rolling gates, 24′ long and 28″ high, constructed of 2″ and 3″ schedule 80 pipe that form four (4) courses, go across the openings when the ferry is in transit. The gates are supported by one (1) steel wheel attached to the bottom rail near the aft end of the gates and a fixed guide roller welded to the deck forward of the openings in the bulwarks. Additionally, two (2) fixed guide rollers 54″ apart enclosed in supporting brackets welded to the vessel's upper bulwark, restrain the gates' top rail such that the gates only slide fore and aft as they are opened or closed. The design·plan of the vessel depicts a pin or locking device to lock the gate into the opened and closed positions. At the time of the incident one was installed for the closed position but not for the opened position. (See Plaintiff's Exhibit 6; Testimony of John Cunningham and Arthur Darden. Testimony of Arthur Darden, John Cummings and Captain Royce Ehret. Plaquemines Parish Trial Exhibits 7,8,9 and 10).

6.

On April 15, 2001, the M/V POINTE–A–LA–HACHE was manned by a four (4) person crew including Captain Royce Ehret, Engineer Frank Pellegal, and deckhands, Joseph Longino and Carlton Huntington. These crewmembers began their shift aboard the vessel at approximately 2:30 p.m. on April 15, 2001. (Testimony of Captain Royce Ehret, Frank Pellegal, Joseph Longino and Carlton Huntington).

**7.**

When the M/V POINTE-A-LA-HACHE docked at the Belle Chasse landing on April 15, 2001, Huntington was responsible for securing the port bow line of the ferry to the corresponding bit on the landing barge, such that the vehicle ramp would be correctly positioned on the deck of the ferry when lowered. He was also responsible for checking to make sure the vehicle ramp was correctly lined up with the opening on the port side bulwark of the ferry, and checking to make sure the rolling gate was completely underneath the bulwark on the forward end of the port side opening. Thereafter, Huntington was responsible for engaging the controls on the landing barge to lower the vehicle ramp to the deck of the ferry after deckhand Longino moored the port stern line of the ferry to the landing barge. In this regard, yellow lines are painted on the deck of the ferry to delineate the correct position of the vehicle ramp when it is lowered to the deck of the ferry. (Testimony of Captain Royce Ehret, Frank Pellegal, Joseph Longino, Carlton Huntington and Arthur Darden).

**8.**

Longino was responsible for securing the stern line and opening the gate. It was necessary to open the gate so that it completely cleared the opening so as to avoid it being hit by the apron or ramp. After lowering the vehicle ramp to the deck of the ferry, both Huntington and Longino were responsible for directing vehicles off the vessel and then directing vehicles onboard the ferry. (Testimony of Captain Royce Ehret, Frank Pellegal, Joseph Longino, Carlton Huntington and Arthur Darden).

**9.**

At approximately 10:50 p.m. on April 15, 2001, the ferry arrived at the Belle Chasse landing at which time Huntington secured the port bow of the ferry to the landing barge. However, when Huntington tied the port bow mooring line he left too much slack in the line which resulted in misalignment between the ramp on the landing barge and the opening on the port side of the ferry. (Testimony of Captain Royce Ehret, Frank Pellegal, Joseph Longino, O'Neal Dorsey, Carlton Huntington and Arthur Darden).

**10.**

Immediately after Huntington tied the port bow mooring line, Logino opened the rolling gate on the port side of the ferry by pushing it forward. He testified that the gate was completely underneath the forward end of the bulwark with the aft end of the gate but admitted it was only about 2″ to 3″ inside the bulwark and not the full distance. Thereafter, Longino walked aft to tie the port stern mooring line to the bit on the landing barge as Captain Ehret landed the port stern of the ferry against the landing barge. (Testimony of Captain Royce Ehret and Joseph Longino).

**11.**

Immediately after tying the port bow mooring line, Huntington walked aft along the port side of the ferry and engaged the controls on the landing barge to lower the ramp to the deck of the ferry, but admittedly did so without first checking the alignment between the ramp and the opening on the port side of the ferry.

**12.**

The testimony of the two eye witnesses, Joseph Longino and O'Neal Dorsey, reveal the following: The vehicle ramp or apron came down and struck the top of the after roller which is attached to the bulwark. The ramp then slipped off of the bulwark and rested on the gate, which was in the opening, causing the gate to become dislodged from its track and fall on Huntington.

13.

When the gate fell inboard, it pushed Huntington down to the deck of the ferry and laid across his legs. Immediately after the accident, Longino, Pellegal and a passenger, O'Neal Dorsey, lifted the gate off Huntington's legs while Captain Ehret called an ambulance to transport Huntington to the hospital. (Testimony of Captain Royce Ehret, Joseph Longino, Carlton Huntington, O'Neal Dorsey, Frank Pellegal, Dr. Walter Truax and Dr. John Freibert, Plaquemines Parish Trial Exhbit 12).

14.

Following the accident Huntington was immediately taken to the West Jefferson Medical Center where he was diagnosed with a fracture of the hip and three bones of his right foot. He underwent surgery on April 17, 2001, during which a plate was permanently and internally affixed over an intertrocanteric fracture of his right hip by an orthopedic surgeon, Dr. Mack Juneau. The three metatarsals in his right foot were treated non-surgically. Examination revealed no bruises or abrasions of the head or neck, and there were no complaints of pain in these areas.

15.

Huntington tolerated the surgery well, and, on April 20, 2001, he was transferred to the West Jefferson Medical Center Rehabilitation Unit where he remained as an inpatient undergoing rehabilitation and physical therapy under the supervision of Dr. Walter Truax, a board certified neurologist with over twenty (20) years experience who is the Director of the West Jefferson Medical Center Rehabilitation Unit and who was formerly the Director of the Stroke Rehabilitation Unit at a hospital in Marrero, Louisiana. (Testimony of Dr. Mark Juneau and Dr. Walter Truax, Plaquemines Parish Trial Exhibits 16, 20, 26 and 36).

16.

On April 30, 2001 Huntington was discharged from the West Jefferson Medical Center Rehabilitation Unit to his home. Upon discharge, Huntington was ambulating with a walker, had no infections, had normal blood chemistry, and his right hip fracture, as well as the fractured metatarsals in his right foot, were healing. (Testimony of Dr. Walter Truax, Plaquemines Parish Trial Exhibit 17).

17.

On May 5, 2001 Huntington was rushed to the Medowcrest Hospital Emergency Room from his home after experiencing left sided weakness. He was subsequently admitted to the hospital by Dr. Betty Dowty, an internest who examined Huntington on the previous day for control of diabetes. (Testimony of Dr. Betty Dowty, Plaquemines Tria Exhibit 32,33).

18.

Upon admission to Meadowcrest Hospital Huntington was diagnosed by the Emergency Room physician as having sustained a right cortical stroke. Shortly after his admission to Meadowcrest Hospital, the Emergency Room physician obtained a neurology consult from Dr. John Freiberg, Jr., a neurologist who had been in private practice with Culicchia Neurological Clinic for two (2) years, to determine whether Huntington was a candidate for the clot-busting drug TPA. (Testimony of Dr. John Freiberg, Plaquemines Parish Trial Exhibit 18).

19.

When Huntington was examined by Dr. Frieberg at Meadowcrest Hospital on May 5, 2001, he advised Dr. Frieberg of the accident he sustained on the ferry on April 15, 2001 and his subsequent orthopedic treatment, but specifically denied injuring his head, neck or upper torso in the accident. Huntington further advised Dr.

Frieberg he was an uncontrolled diabetic, a life long smoker and had a family history of coronary artery disease, hypertension and stroke involving both his father and one (1) of his brothers. (Testimony of Dr. John Frieberg, Plaquemines Parish Trial Exhibit 18).

20.

Following his evaluation of Huntington, Dr. Freiberg was of the opinion that Huntington sustained a right cortical stroke. Differential diagnoses included cardio embolism, carotid artery disease, intercranial carotid or middle cerebral artery disease. Various tests were thereafter ordered to confirm the diagnosis including a CT scan of the head, and a bilateral carotid duplex doppler ultrasonography with spectrum analysis. (Testimony of Dr. John Freiberg, Plaquemines Parish Trial Exhibits 18, 21, 22, 24, 25, 28 and 29).

21.

Upon receiving the results of Huntington's CT scan of the head and his bilateral carotid duplex doppler ultrasound with spectrum analysis, Dr. Dowty requested a consult with Dr. Mark Kappelman, a vascular surgeon with over thirty (30) years of experience treating stroke victims. Dr. Kappelman, upon reviewing Huntington's test results, confirmed that he had suffered a right cortical stroke as a result of 95% to 98% occlusion of his right internal carotid artery, a condition that preexisted Hutington's April 15, 2001 accident. (Testimony of Dr. Betty Dowty, Dr. Walter Truax and Dr. Mark Kappelman. Plaquemines Parish Trial Exhibits 22, 24, 25, 28, 29 and 30).

22.

Huntington was subsequently transferred from Meadowcrest Hospital back to the West Jefferson Medical Center Rehabilitation Unit under the care of Dr. Truax where he remained until June 8, 2001. Thereafter, he was discharged to his home and subsequently moved in with his daughter who resides in Holden, Louisiana. (Testimony of Dr. Betty Dowty, Dr. Walter Truax, Theresa Stevens, Plaquemines Parish Trial Exhbit 19).

23.

Huntington continued to reside with his daughter until June 2002 at which time he was hospitalized at Lane Memorial Hospital for pneumonia. He was subsequently released to the Villa Feliciana Medical Complex in Jackson, Louisiana, which is a state owned, skilled nursing home facility where Huntington continues to reside. Upon admission to Villa Feliciana Medical Complex, Huntington received, free of charge, room and board, and his medical treatment was paid by government benefits, including Medicare and Medicaid. Additionally, he qualified for and is receiving Social Security Disability Benefits. (Testimony of Carlton Huntington, Theresa Stevens and Dr. Monique Attuso).

24.

The testimony presented by Huntington's treating orthopedist, Dr. Mark Juneau, as well as Dr. Robert Steiner, a board certified orthopedist who examined Huntington at the request of Plaquemines Parish, is that the injuries Huntington sustained as a result of the April 15, 2001 accident aboard the M/V POINTE–A–LA–HACHE were limited to a right intertrocanteric hip fracture and fractures of three (3) metatarsals in Huntington's right foot. All fractures healed with satisfactory bone union except one which was a facie or fibrous union which may have required additional surgery. However, the stroke has left Huntington totally and permanently disabled. (Testimony of Dr. Mark Juneau, Dr. Robert Steiner, Dr. Betty Dowty, Dr. Monique Attuso, Dr. Truax and Dr. Mark Kappelman).

**25.**

With respect to the right cortical stroke that Huntington sustained on May 5, 2001, the medical evidence presented at trial by Huntington's treating physicians, including Dr. Dowty, Dr. Truax and Dr. Kappelman, is that Huntington's stroke was caused by a 95% to 98% occlusion of claimant's right internal carotid artery, a condition that preexisted his accident and that was not in any way caused, occasioned or aggravated by the accident Huntington sustained on April 15, 2001 aboard the ferry. (Testimony of Dr. Betty Dowty, Dr. Walter Truax, Dr. Mark Kappelman and Dr. Robert Steiner).

**26.**

Dr. John Freiberg disputes this conclusion. His opinion is that Huntington's stroke was caused and/or precipitated by the incident aboard the M/V POINTE–A–LA–HACHE on April 15, 2001

**27.**

Huntingon has received maintenance benefits from Plaquemines Parish from April 15, 2001 until trial, and nothing is presently due and owing.

## CONCLUSIONS OF LAW

**1.**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333, 46 U.S.C.App. § 688 and the general maritime law. Additionally, jurisdiction over Plaquemines Parish's complaint for exoneration from, or alternatively, limitation of liability arises under 46 U.S.C.App. § 181, et seq. The applicable substantive law is the Jones Act, General Maritime Law, and the Limitation of Liability Act.

**2.**

■ Under the Jones Act, employers of seamen have a duty to provide their employees with a reasonably safe place to work. 1 Schoenbaum, Admiralty and Maritime Law, 319 (2d Ed.1994). Also under

the law applicable to this case, the seaman's employer is legally responsible for the negligence of one of its employees while that employee is acting in the course and scope of his job. Gilmore & Black, The Law of Admiralty 277 (2nd Ed.1975). The Jones Act, as it is interpreted by the Court, also addresses the responsibilities of the seaman. Under the Jones Act, a seaman is obligated to act with ordinary prudence under the circumstances. In other words, a seaman has the duty to exercise that degree of care for his or her own safety that a reasonable seaman would exercise under the same or similar circumstances. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir.1997).

**3.**

■ In addition to his claim for negligence under the Jones Act, Huntington also has made a claim for unseaworthiness against Plaquemines under the general maritime law. In this regard Plaquemines, as owner of the M/V POINTE–A–LA HACHE, owes a member of the crew such as Huntington a non-delegable duty to provide a seaworthy vessel, which is generally defined as a vessel, crew and appurtenances that are reasonably fit for the vessel's intended purpose. Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971).

**4.**

■ The mere fact that an injury occurs, however, does not establish a vessel is unseaworthy. Moreover, the general maritime law does not require a shipowner to provide the newest or best equipment, but only a vessel that is suitable for its intended use. *Little v. Green,* 428 F.2d 1061 (5th Cir.1970).

**5.**

Under the Limitation Act, 46 U.S.C. § 183 et seq., a vessel owner is entitled to

limit its liability to the value of the vessel after the casualty for the negligence of its employees if the casualty occasioned or occurred without the vessel owner's privity or knowledge. 46 U.S.C. § 183. Generally, privity or knowledge refers to the vessel owner's personal participation in, or actual knowledge of, the specific acts of negligence or conditions of unseaworthiness, which caused or contributed to the casualty. *Nuccio v. Royal Indemnity Co.,* 415 F.2d 228 (5th Cir.1969); *Cupit v. McClanahan Contractors, Inc.,* 1 F.3d 346 (5th Cir.1993).

6.

■ A claim for maintenance and cure against Plaquemines Parish would arise under the general maritime law. Under the general maritime law, Plaquemines Parish owes a seaman employee maintenance and cure from the date of injury in the service of the ship and until he reaches maximum medical cure or incurability. *The Osceola,* 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903); *Vella v. Ford Motor Co.,* 421 U.S. 1, 95 S.Ct. 1381, 43 L.Ed.2d 682 (1975); *Rashidi v. American President Lines,* 96 F.3d 124 (5th Cir.1996); *Caulfield v. AC & D Marine, Inc.,* 633 F.2d 1129 (5th Cir.1982); *Dowdle v. Offshore Express, Inc.,* 809 F.2d 259 (5th Cir.1987). Huntington has received maintenance and cure from the date of his injury through the trial. Thus, he has no claim for past or current maintenance and cure.

7.

In the present case, it is the conclusion of the Court, after hearing the testimony, observing the demeanor of the witnesses, reviewing the exhibits and the record, that the incident board the M/V POINTE-A-LA-HACHE on April 15, 2001, was due to the negligence of Longino, the unseaworhtiness of the M/V POINTE-A-LA-HACHE, and the negligence of Huntington. Moreover, Plaquemines had privity and knowledge of the unseaworthy condition and is not entitled to limit its liability.

8.

First, with regard to Longino, the Court finds that in opening the gate he either left a portion of it in the opening or did not push it far enough into the bulwark. If he had opened the gate fully or pushed it farther into the bulwark, it would not have been hit by the apron or ramp and dislodged and caused to fall on Huntington.

9.

■ Next, with regard to the unseaworthiness of the M/V POINTE-A-LA-HACHE the Court considers that the time of the incident there was no locking device by which the gate could have been locked in the open position. This was known by the vessel owner. Such a device was called for by the design plans and was feasible both economically and as a practical manner as evidenced by the fact that following the April 15th incident one was installed and is effectively in use today. If there were such a locking device at the time of the incident on April 15th, the gate would have bene opened fully and locked in place. It would not have been hit by the apron and knocked out of its tracks and pushed on to Huntington. The defendant argues that a locking device would not have prevented the gate from being pushed onto Huntington but there is no evidence to support this view. In fact, there is evidence to the contrary. This was not the first time that the apron or ramp was allowed to hit the bulwark. From the evidence presented at the trial one is left to conclude that if it does not happen frequently, it certainly is not unusual. And yet, this is the first time that the gate was knocked off its track. This supports the conclusion that the reason the gate was knocked off its track on this occasion is because the apron came in contact with the gate itself.

**10.**

The defendant argues that if the ramp had hit the gate it would have bent it or left some dent and none were found. Two eye witnesses saw the incident. One was a passenger who has no interest in this litigation. The other is the plaintiff's co-worker whose duty it was to properly open the gate, and, of course, the gate was not properly opened. There is no personal benefit to him to admit that the gate was in the opening and was hit by the apron. From their demeanor and testimony, the Court finds these witnesses credible. Experts retained by the defendant who were not eyewitnesses and who examined the gate some time after the incident cannot trump credible eyewitnesses. Furthermore, if the apron first hit the bulwark and simply slipped onto the gate knocking it off the track, one might not expect to see a dent or crush mark on the gate. There are certainly scuff marks on the top of the gate as is clearly evident from the photographs of the gate introduced into evidence. In any event, the eyewitnesses said the gate was hit, and for this to occur, the gate had to be in the opening and this would not have occurred if the gate was locked in place.

**11.**

Finally with regard to the negligence of Huntington, he allowed too much slack in the bow mooring line; he failed to check the vessel's position before lowering the apron, and he failed to stop the apron's descent before it came into contact with the bulwark and/or gate.

**12.**

As a result of being hit by the gate Huntington was pushed or knocked to the deck. He fractured his hip and three bones in his foot. All of the fractures healed with bone to bone union except one which is a bone to facie or fibrous union. This union could require further surgery. These injuries and the pain, discomfort and disabilities associated with them were caused by the incident on April 15, 2001.

**13.**

Approximately one month after his discharge Huntington had a stroke. Dr. John Freiberg testified that he believes the incident aboard the M/V POINTE-A-LA-HACHE on April 15, 2001 caused the stroke. This conclusion is inconsistent with the testimony and evidence. In fact, it is not supported by any of the myriad of tests administered to Huntington before or after his stroke. Moreover, when he was first deposed, Dr. Freiberg said he could not say whether there was any relationship between Huntington's trauma and his stroke without first seeing all of the tests. After seeing the tests, he agreed that they added nothing to support a relationship, but yet he now concludes there is a relationship between the trauma and stroke. The Court is unpersuaded by Dr. Freiberg's testimony. The court concludes that Huntington failed to prove that his stroke was caused, aggravated or precipitated by the incident of April 15, 2001. The two are separate and distinct from one another and have no relationship.

**14.**

Considering the respective status of Longino, Huntington and the vessel/vessel owner, and the duties and responsibilities consistent with their status and their power and opportunity to do anything about the procedure and equipment involved, it is the conclusion of the Court that percentage of fault attributed to each is as follows: Longino—30%; Huntington—30%, and the vessel/vessel owner (for unseaworthiness)—40%. Of course, Longino was in the course and scope of his employment so his negligence is attributed to his employer, the vessel owner, Plaquemines.

**15.**

■ It is now appropriate to consider damages:

(a) Past economic losses . . . . . $ 40,000.00

(b) Future economic losses . . . $ 10,000.00

(c) Past, present and future pain and suffering associated with the orthopedic injuries and disabilities associated with them . . . . . $300,000.00

**16.**

In summary, the Court concludes that Huntington sustained damages in the amount of $350,000.00, ($100,000.00 of which is attributed to past damages and $250,000.00 for future damages).

**17.**

■ It is well settled that in an action at law under the Jones Act, the recovery of prejudgment interest is not permitted. *Theriot v. J. Ray McDermott,* 742 F.2d 877 (5th Cir.1984). Nevertheless, the same rule does not apply to Jones Act cases brought under the court's admiralty jurisdiction, particularly when it is joined with a claim for unseaworthiness under the general maritime law. This is an admiralty case, tried without a jury. Pursuant to the court's admiralty jurisdiction invoked under the Federal Rules of Civil Procedure 9(h). When a Jones Act case is brought under the court's admiralty jurisdiction and hence, the case is tried to the court and not to a jury, an allowance of prejudgment interest is within the discretion of the trial court, even if there is not a finding of unseaworthiness. *Williams v. Reading and Bates Drilling Co.,* 750 F.2d 487 (5th Cir.1985). *See also, Doucet v. Wheless Drilling,* 467 F.2d 336 (5th Cir. 1972). The Court finds that an award of prejudgment interest from date of judicial demand is appropriate in this case at the rate of 1.46% on the plaintiff's past damages, as described above. *Martin v. Walk, Haydel and Associates,* 794 F.2d 209, at 212 (5th Cir.1986).

*SUMMARY*

On the basis of the foregoing findings of fact and conclusions of law the Court finds that Carlton R. Huntington has sustained damages resulting from his accident aboard the M/V POINTE–A–LA–HACHE on April 15, 2001 in the following amounts:

(a) Past economic losses . . . . . $ 40,000.00

(b) Future economic losses . . . $ 10,000.00

(c) Past, present and future pain and suffering associated with the orthopedic injuries and disabilities associated with them . . . . . $300,000.00

for a total of $350,000.00. Since the defendant/petitioner is 70% responsible for this loss, it is liable to Carlton R. Huntington for $245,000.00 with prejudgment interest from the date of judicial demand for the amount representing past losses at the rate of 1.46%, and interest from the date of judgment for future losses at the current judicial rate. Furthermore, Plaquemines' petition for exoneration from and/or limitation of liability is denied.